**Usha VAKHARIA, M.D.,**
**Plaintiff–Appellant,**

v.

**SWEDISH COVENANT HOSPITAL, Nancy Loeber, M.D., Demetrius A. Trakas, M.D., et al., Defendants–Appellees.**

No. 97–4235.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 17, 1999.

Decided Sept. 9, 1999.

Allen E. Shoenberger, Loyola University School of Law, Chicago, IL; John F. O'Meara (argued), Chicago, IL, for Usha Vakharia.

Edwin E. Brooks, Paul A. Haskins (argued), Thomas J. Meier, Katten, Muchin & Zavis, Chicago, IL, for Swedish Covenant Hospital, Nancy Loeber, Demetrius A. Trakas, Michael Plunkett and Loren Dardi.

Scott T. Kragie, Squire, Sanders & Dempsey, Washington, DC, for American Society of Anesthesiologists, Louis Blancato, Charles Vacanti and Ronald Wender.

Before CUDAHY, COFFEY and DIANE P. WOOD, Circuit Judges.

CUDAHY, Circuit Judge.

Usha Vakharia worked as an anesthesiologist at Swedish Covenant Hospital (SCH) from 1974 until 1989 when her hospital privileges were terminated ostensibly because of a lack of quality in her care of her patients. Vakharia filed a seven-count complaint against SCH and other defendants alleging, among other things, discrimination on grounds of race, national origin, sex and age. The district court entered summary judgment in favor of the defendants on all counts. Vakharia now appeals and we affirm.

*Background*

Vakharia, a foreign-born, Asian–American woman and over the age of 40 at all relevant times, is a board-certified anesthesiologist, trained in the United States in her specialty. In 1974, she was appointed to the staff of SCH, a not-for-profit hospital located in Chicago. She was reappointed each year through 1989 and her privileges were increased in 1981 and 1983. For several months in 1984, Vakharia served as the acting head of the anesthesiology section. That same year, in response to complaints by the Chicago Board of Health regarding substandard equipment and improper equipment care, SCH took steps to improve its anesthesiology services. It hired Dr. Nancy Loeber, a white, American-born woman, as director of anesthesiology with a mandate to enhance the quality of anesthesiology care. Vakharia contends that she applied for the position of director but that her candidature was not considered; SCH points to a lack of evidence in the record that she had in fact applied.

In any event, by January 1986, anesthesiology had been designated a separate department within SCH. As chair of the department, Loeber assumed responsibility for supervising anesthesiology personnel—including staffing decisions and case assignments—and for establishing quality control procedures. The composition of the anesthesiology department changed considerably over the next few years. In 1984, all five anesthesiologists at SCH were foreign-born (four female and one male). Between 1985 and 1987, Loeber expanded the department with four new recruits (three male and one female), each of whom was white and American-born.

Loeber's first brush with Vakharia took place in March 1987, when Loeber conducted a performance audit on Vakharia. The audit identified 13 cases—11 in the previous year—in which Vakharia had experienced difficulty intubating patients or had failed to properly supervise unstable patients in the recovery room. Responding to Loeber's request for an explanation, Vakharia denied that the 13 cases reflected problems with her care and claimed that Karen Filipkowski, the nurse who had prepared several of the incident reports, was biased against her. In September 1987, motivated by a desire to spend more time with her family, Vakharia requested and received permission from Loeber to go on

part-time rotation. The following March, Loeber conducted a poll of 35 of the 71 hospital surgeons· concerning their preferences among the anesthesiologists. Of the responses received, Vakharia was the least, or close to the least, preferred.

In January 1988, Loeber introduced new criteria for the assignment of cases among the anesthesiologists on the basis of senior and junior status. Originally, board-certification was to be the benchmark for senior status but Loeber subsequently decided to determine seniority based on her own assessment of medical competence. Three anesthesiologists were classified as senior: Johanna Chookaszian (a white, American-born female), Howard Konowitz (a white male) and Tun Myint (an Asian-born male). Of the three, only Chookaszian was board-certified On the other hand, in April 1988, Vakharia was classified as junior despite the fact that she was board-certified. Around the same time, two other female Asian–American anesthesiologists were also placed in junior status. Loeber wrote to each of the three indicating that she could not guarantee them work and suggesting that they explore employment opportunities elsewhere.

In June 1988, Vakharia requested that she be restored to full-time rotation and designated a senior anesthesiologist. Loeber refused, stating that the departmental caseload would not support another full-time position and that Vakharia had not demonstrated sufficient proficiency in dealing with complex cases. On the basis of a review conducted by the Quality Assurance Department, Loeber identified 66 cases in which Vakharia had demonstrated inadequate job performance. Vakharia complained to SCH's Medical Executive Committee (MEC) which appointed a task force to look into the matter. The task force

recommended that the MEC defer to Loeber's evaluation as chair but voted to retain an outside consultant to conduct an independent review. By this time, working relations between Loeber and Vakharia had reached an all-time low.[1]

In November 1988, the American Society of Anesthesiologists (ASA), an independent association of anesthesiologists, was brought in to review the anesthesiology department. The ASA reviewers, Drs. Ronald Wender and Louis Blancato, were asked to address three specific issues: (1) the staffing needs of the department, (2) the quality of care provided by certain individual anesthesiologists and (3) the possible restructuring of the department.[2] Wender and Blancato reviewed materials submitted by SCH and by Vakharia, conducted on-site visits to the hospital and interviewed individual anesthesiologists. One or both of them spoke with Vakharia on three occasions, and Wender personally observed Vakharia at work in the operating room. The resulting ASA report, completed in June 1989, specifically criticized the quality of care provided by Vakharia and the two other female, Asian–American anesthesiologists. The report noted that all three anesthesiologists were responsible for "some very serious complications attributable to substandard care ... indicative of a poor quality of anesthesia care, rather than a complication which one would expect as a natural result of anesthesia and/or surgery involved." Appellant's 2d Supp.App., tab 6 at 13. In Vakharia's case, the report identified general problems intubating patients and cited inadequate management of complex classes of cases. The ASA recommended that the staff privileges of Vakharia and the two other female, Asian–American anesthesiologists not be renewed.[3] SCH gave each of

1. For example, Vakharia began soliciting work primarily from foreign medical graduates. She also initiated her own review of the records of other anesthesiologists. Loeber responded by restricting Vakharia's access to Loeber's office where some emergency supplies were housed.

2. The hospital played no role in the selection of Wender and Blancato. Moreover, neither reviewer had any prior association with Loeber or Vakharia.

3. The ASA noted that the ongoing dispute between Loeber and Vakharia had created a rift in the staff of SCH and that the foreign

the three the option to resign. Only Vakharia chose to stay on and was duly suspended on July 31, 1989. In the meantime, Loeber had resigned on April 27, 1989, effective July 1, 1989.

On August 24, 1989, Vakharia requested a formal due process hearing under the SCH bylaws. An *ad hoc* peer review committee of five SCH physicians—appointed by the hospital administration—reviewed documentary evidence and conducted 19 days of hearings into the propriety of Vakharia's summary suspension. Attorneys were allowed to attend in an advisory capacity only, although Vakharia's attorney or, alternatively, one of her experts, was permitted to conduct cross-examination on her behalf. Of SCH's four witnesses, two were key: Loeber testified for SCH on the problems she had identified with the quality of Vakharia's care, and Wender delivered his independent evaluation of Vakharia's performance gleaned through the ASA review process. For her part, Vakharia presented 21 witnesses in all. Seventeen SCH physicians testified that they had observed no improprieties on Vakharia's part and that they had confidence in her ability to care for their patients. Vakharia also brought in two experts: Dr. Floyd Heller, Associate Professor of Anesthesiology at Rush Medical College, and Dr. James O'Brien, Chief of Anesthesiology at Central DuPage Hospital. Heller and O'Brien generally defended the quality of Vakharia's care but were critical of some of her practices. Although Vakharia chose not to testify directly on her own behalf, she was questioned by SCH.

The committee found that "Dr. Vakharia's treatment of patients over a period of years did not meet the requisite standard of care and her professional judgment is so severely impaired that she is a potential threat to patients." Appellant's 2d Supp.App., tab 7 at 6. Thus, it was the unanimous recommendation of the committee that Vakharia's suspension be affirmed and that she not be reappointed to the medical staff. The committee relied in large measure on the ASA report and on the testimony of Wender whom it considered "extremely well-qualified, neutral and objective." *Id.* at 3. In contrast, the committee found Vakharia's own witnesses unpersuasive.[4] In short, the committee concluded that "none of Dr. Vakharia's witnesses effectively rebutted the compelling testimony of Dr. Wender and Dr. Loeber." *Id.*[5]

SCH adopted the committee's recommendation and terminated Vakharia's hospital privileges. Vakharia then unsuccessfully appealed the decision through two further levels of internal review: the appellate committee (a body appointed under the SCH bylaws) and the Board of Directors. Her termination was affirmed on September 13, 1990. Vakharia had initiated proceedings before the EEOC as early as August 4, 1989, which led in due course to the present lawsuit. Before the district court, she alleged (1) discrimination in violation of Title VII, the ADEA, and §§ 1981 and 1985, (2) breach of contract, (3) breach of SCH bylaws, and (4) a Sherman Act conspiracy claim. The defendants moved for summary judgment on all counts, and Vakharia brought her own motion for partial summary judgment (on all claims other than the Sherman Act

---

medical graduates saw Vakharia as a rallying point for preserving their presence at SCH.

4. The testimony of Heller and O'Brien was described as "vague, overly broad and unconvincing." Appellant's 2d Supp.App., tab 7 at 4. And the contribution of the 17 physicians was, in the committee's view, more in the nature of character than expert testimony.

5. The committee expressed its disappointment at Vakharia's unwillingness to engage the review process in earnest; specifically, her failure to testify personally on her own behalf, answer directly the questions of committee members or address specific cases relating to the quality of her care. It noted that in her cross-examination, Vakharia "steadfastly avoided asking Dr. Wender questions about her several cases which he specifically examined," despite the fact that the committee "repeatedly implored [her]" to do so. Appellant's 2d Supp.App., tab 7 at 3.

claim). The district court concluded that Vakharia had failed to raise a genuine issue as to whether the termination of her hospital privileges was based on a good faith belief that the quality of her care was substandard. Determining that her various claims essentially turned on the same facts, the district court granted the defendants' motion for summary judgment and denied Vakharia's motion for partial summary judgment.

*Standard of Review*

We review the district court's decision to grant summary judgment *de novo, see Johnson v. Zema Systems Corp.*, 170 F.3d 734, 742 (7th Cir.1999), applying the same criteria as the district court. *See Rodriguez v. City of Chicago*, 156 F.3d 771, 775 (7th Cir.1998). We review the record and all reasonable inferences from it in the light most favorable to Vakharia, the non-movant. *See Senner v. Northcentral Technical College*, 113 F.3d 750, 754 (7th Cir. 1997). To defeat summary judgment, she must set forth specific facts demonstrating that there is a genuine issue for trial. *See* FED.R.CIV.P. 56(c); *Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 864 (7th Cir.1996).

*Employment Relationship*

■ The district court determined that Vakharia lacked standing to assert Title VII and ADEA claims because she was an independent contractor and not an employee. In *Alexander v. Rush North Shore Medical Center*, we held that an anesthesiologist with staff privileges at a hospital is an independent contractor on the basis of the following five-factor test:

(1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required,

including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

101 F.3d 487, 492 (7th Cir.1996) (internal quotation and citation omitted). Among other things, we noted that Dr. Alexander possessed significant specialized skills and had authority to exercise his own independent discretion concerning the care he delivered to his patients; he was self-employed for tax purposes and was responsible for paying for his own malpractice insurance and employment benefits; and he billed his patients and collected fees from them directly. *See id.* at 493.

The present case is on all fours with *Alexander*. While Vakharia's situation was not identical with that of Alexander in all respects—for example, she could not associate herself with other hospitals—her responsibilities and working arrangements were essentially the same. It is undisputed that Vakharia was self-employed for tax purposes, that she paid her own malpractice insurance and that she received no benefits from SCH. That the anesthesiologists at SCH were regarded as independent contractors is confirmed by an agreement for anesthesiology department services concluded between Loeber and SCH. The agreement expressly refers to anesthesiologists as independent contractors, not employees.[6] Vakharia claims that her situation is distinguishable from *Alexander* in the degree of control SCH exercised over her work. We have previously recognized that the employer's right to control is the most important though by

---

6. The agreement states: "Anesthesiologists to be Independent Contractors: In the performance of the work, duties and obligations undertaken by Dr. LOEBER under this Agreement, it is understood and agreed that Dr. LOEBER and those physicians specializing in Anesthesiology contracting with her to render the services called for in this Agreement, are

at all times acting and performing as an [sic] independent contractors. The HOSPITAL shall neither have nor exercise control or discretion over the methods by which Dr. LOEBER or her physician contractors shall perform their work ...". Appellant's Supp. App., tab 10 at 5.

no means the sole element in the equation. *See Ost v. West Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 438 (7th Cir. 1996). But Vakharia does not point to any specific evidence that would substantiate her claim that SCH exercised close control or call into question the express statement in the agreement between Loeber and SCH to the contrary.

█ As a separate matter, Vakharia asserts that she is an employee for the purposes of her discrimination claims by virtue of her 1984 application for director of the anesthesiology service (the position to which Loeber was appointed). We disagree. The same agreement between Loeber and SCH confirms that Loeber—the occupant of the position at all relevant times—was an independent contractor as well. And, as in the case of the anesthesiologists Loeber supervised, there is nothing in the record that would cause us to doubt that Loeber's relationship with SCH mirrored the agreement in practice. Thus, whether as an anesthesiologist or an applicant for the position of director of the service, Vakharia was an independent contractor at all relevant times. Since Vakharia was not an employee, we agree with the district court that her Title VII and ADEA claims must fail.

### Sections 1981 and 1985

█ We turn to Vakharia's remaining discrimination claims, Count II (§ 1981 claims against SCH and Loeber) and Count V (§ 1981 and § 1985 claims against SCH, Loeber, Chookaszian, and certain individual members of the SCH Board of Directors). Section 1981 prohibits dis-crimination on grounds of race in the making and enforcing of contracts. *See* 42 U.S.C. § 1981(a). Section 1985 bars conspiracies that interfere with civil rights, on any grounds. *See* 42 U.S.C. § 1985(3). In examining Vakharia's § 1981 claim, we employ the same framework that we use with respect to Title VII claims. *See Gonzalez v. Ingersoll Milling Machine Co.*, 133 F.3d 1025, 1035 (7th Cir.1998); *Bratton v. Roadway Package System, Inc.*, 77 F.3d 168, 176 (7th Cir.1996).

█ A claim of employment discrimination can be proved by showing direct or indirect evidence of discrimination. Where, as here, the plaintiff is relying on indirect evidence,[7] we apply the familiar burden-shifting method established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. To establish a *prima facie* case of employment discrimination, Vakharia must present evidence that: (1) she was a member of a protected class; (2) she was qualified for the job in question or was meeting SCH's legitimate performance expectations; (3) she suffered an adverse employment action; and, (4) SCH treated similarly situated persons outside the protected class more favorably. *See Johnson*, 170 F.3d at 742–43; *Gonzalez*, 133 F.3d at 1032.

█ Once Vakharia establishes this *prima facie* case, there is a presumption of discrimination that obliges SCH to produce a legitimate, nondiscriminatory reason for its decision. If SCH can so do, the burden shifts back to Vakharia to present evidence that SCH's proffered reason is

---

7. Vakharia purports to present evidence of direct discrimination in the form of certain isolated comments, *e.g.*, on the part of Loeber (that Chookaszian was "an all-American blond with a funny last name") and SCH President, James McCormick (that Vakharia should resign in order to avoid airing "dirty laundry"). Direct evidence of discrimination, however, is "evidence which if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Greenslade v. Chicago Sun-Times, Inc.*, 112 F.3d 853, 863 (7th Cir.1997) (internal quotation and citation omitted). In the present case, we endorse the district court's conclusion that these comments—which are in the nature of stray remarks—though insensitive, do not in themselves establish a discriminatory animus. *See Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397, 1403 (7th Cir.1996) (noting that in order to establish direct evidence of discrimination, a plaintiff must identify a link between stray workplace remarks and the adverse employment action at issue).

pretextual. *See Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998); *Gonzalez*, 133 F.3d at 1032. Pretext in this context means "a lie, specifically a phony reason for some action." *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir.1999) (internal quotation and citation omitted). Vakharia may establish pretext by showing evidence that SCH was more likely than not motivated by a discriminatory reason or that SCH's explanation is not worthy of credence (*i.e.*, that the explanation was factually baseless, that it was not SCH's actual motivation or that it was an insufficient rationale for SCH's action). *See id.* at 983; *Debs*, 153 F.3d at 395–96. Vakharia bears the ultimate burden of demonstrating an impermissible motive or intent. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Johnson*, 170 F.3d at 742.

 At least at first blush, Vakharia appears to have the makings of a *prima facie* case: she and two other Asian-American anesthesiologists had their privileges terminated whereas their white, American-born colleagues—some of them new recruits—remained in place. It is undisputed that Vakharia comes within the protected class and that she has suffered an adverse employment action—the termination of her staff privileges. Thus, SCH concedes that she has met the first and third factors of her *prima facie* case. The key issue on appeal is whether Vakharia was meeting SCH's legitimate performance expectations (the second element of her *prima facie* case). Of course, this element of the *prima facie* case dovetails with the issue of pretext; both inquiries focus on the factual question of whether Vakharia was providing an adequate standard of patient care. Since the parties have chosen to frame the case in terms of pretext, we will follow their lead and, for present purposes, we will assume that Vakharia has made out a *prima facie* case. *See Debs*, 153 F.3d at 395–96; *Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397, 1404 (7th Cir.1996). Thus, Vakharia has the burden of demonstrating that SCH's proffered nondiscriminatory reason for its action—that her care was substandard and harmful to her patients—was a mere pretext for discrimination. In so doing, Vakharia is constrained by the two-year statute of limitations for § 1981 claims: she must present evidence pertaining to events that took place after November 8, 1988 (two years prior to the filing of the present action).[8]

Vakharia maintains that Loeber undermined Vakharia's professional standing at SCH as part of a broader campaign to purge the anesthesiology department of foreign-born or foreign-educated personnel. An examination of staffing changes in the department lends some support to this view. Over a five-year period, the racial and/or ethnic makeup of the anesthesiology department underwent a significant transformation. In 1983, the professional staff was entirely foreign-born. Between 1985 and 1987, however, Loeber hired four white, American-born anesthesiologists. And, of course, in 1988, Vakharia and the two other female, Asian–American anesthesiologists were forced out of the department. We are mindful that the value of this kind of circumstantial evidence is limited where, as here, the workplace is unusually diverse. At the time of the ASA review, for example, foreign-born or educated professionals comprised roughly half

---

**8.** Vakharia's claim that SCH discriminated against her by refusing to consider her for the position of director of the anesthesiology section in 1984 falls outside the statute of limitations. Nor has Vakharia presented evidence of a continuing violation that would enable her to reach back to this time frame. Specifically, this claim is insufficiently proximate in time to Vakharia's other claims which, moreover, implicate other decisionmakers and involve other kinds of employment decisions. *See Filipovic v. K & R Express Systems, Inc.*, 176 F.3d 390, 396 (7th Cir.1999) (discussing the continuing violation doctrine in the more familiar context of workplace harassment). Thus, we need not consider whether Vakharia actually applied for the position in question—a factual contention which the appellees keenly dispute.

of SCH's medical staff and were equally represented on the MEC and in departmental chairs. Nevertheless, these changes in the composition of anesthesiology personnel clearly place a cloud of suspicion over Loeber's *modus operandi*.[9]

Such evidence standing alone, however, is insufficient to establish pretext. *See Testerman v. EDS Technical Prods. Corp.*, 98 F.3d 297, 304–05 (7th Cir.1996) (fact that terminated employees fell within the protected class, without more, did not cast doubt on employer's articulated reason for discharging one of them). The appellees contend that Loeber's staffing decisions were based purely on merit; after all, Loeber was appointed with a mandate to shake up and improve the department. To survive summary judgment, Vakharia must refute the appellees' contention that quality of care concerns motivated the termination of her privileges. We need not pass judgment on whether Vakharia's care was or was not inferior by reference to standards within the hospital or the profession. The issue here is whether the *ad hoc* peer review committee—the primary decisionmaker in this case—genuinely believed that the care she provided was inferior. *See Debs*, 153 F.3d at 396; *Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 890 (7th Cir.1997) (plaintiff will not prevail if employer honestly believed in the nondiscriminatory reasons it offered).

Vakharia maintains that the criticisms of the quality of her care were entirely without foundation. In support she relies principally on an affidavit by Heller, dated January 25, 1995, in which he expands on the testimony he delivered to the *ad hoc* peer review committee. *See* Appellant's Supp.App. at tab 8. Heller takes issue with Loeber on a number of counts. He states that many of her occurrence reports in-

volving Vakharia's cases were undated or unsigned and that in some cases criticisms had not been made contemporaneously with the events outlined. He questions the accuracy of her testimony before the committee, identifying inconsistencies with respect to specific cases. Heller also challenges the scope of the ASA review of Vakharia's performance and the specificity of the report's findings. Unfortunately for Vakharia, however, the committee did not have the benefit of this evidence (Heller's expanded testimony) during its lengthy consideration of her case in 1988. Since our task is to focus on the honesty of the committee's explanation for its recommendation that Vakharia's privileges not be renewed, *see Debs*, 153 F.3d at 396, our inquiry is necessarily limited to the evidence that the committee actually had at its disposal.

On the basis of our review of the committee hearings, we think that the quality of care issue is a somewhat closer call than the district court would suggest. The record is by no means devoid of evidence favorable to Vakharia. Independent experts Heller and O'Brien testified that, in their view, Vakharia generally met the requisite standard of care. In addition, 17 SCH doctors testified that they had confidence in Vakharia's abilities. Notwithstanding the nonspecific nature of this evidence, we think that the committee may have been unduly dismissive of the contribution of these professionals to an evaluation of Vakharia's work performance.

Nonetheless, we subscribe to the district court's ultimate conclusion that significant aspects of Loeber's and Wender's testimony went unchallenged. The record indicates that Vakharia squandered ample opportunities to bolster her case before the

---

9. Vakharia also attributes a discriminatory motive to Loeber's assignment of cases under the senior-junior classification. Although outside the statute of limitations, the events surrounding this practice may potentially lend support to claims coming within the statutory period. We note that the fact that Vakharia had voluntarily moved to part-time rotation

may have had some bearing on the assignment of cases to others within the department. But in any event, since Loeber's primary rationale for denying Vakharia senior status was a lack of proficiency in her management of complex cases, the issue of case assignment falls within the broader question of quality of care which we address below.

committee. A reading of the transcript of the hearings suggests that neither she nor her experts got to grips with the heart of SCH's evidence, namely, the numerous specific cases involving allegedly improper care documented by Loeber and reviewed by Wender. Although Heller and O'Brien addressed certain of the cases cited by Loeber, their direct testimony was for the most part pitched at a general level of discussion. Heller—arguably Vakharia's most important witness—was asked by the committee to return for cross-examination on the quality of care issue but did not do so. Vakharia cross-examined Loeber and Wender at length but failed to challenge their testimony relating to specific cases, notwithstanding the committee's express prompting in that direction.[10] Vakharia declined to exercise her right to testify on her own behalf. However, she did enter a tape recorded statement into the record. In the statement she challenged the propriety of the peer review process and leveled accusations at various members of the SCH administration. Her main defense to the ASA report—and its tacit endorsement of Loeber's specific allegations—was twofold: that the ASA experts saw only what SCH wanted them to see and that she herself was denied access to the relevant medical records. However, neither contention finds any support in the record. Under cross-examination by SCH, Vakharia was argumentative, at times refusing to respond to specific questions and instead resorting to attacks on Loeber's character and to criticisms of the committee.

We think it significant that in deciding to terminate Vakharia's privileges, the committee placed great store in the ASA report and the testimony of ASA expert Wender. The report was based on a thorough review by independent, qualified professionals on whose credentials the committee was entitled to rely. Moreover, it specifically addressed the key issue of the quality of Vakharia's care. We can find no support in the record for Vakharia's claim that Wender and Blancato were not privy to all of the relevant information. Indeed, Vakharia has not raised any evidence to show that the ASA report was in any way tainted.

■ We have previously recognized that we "[do] not sit as a super-personnel department that reexamines an entity's business decisions." *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir.1986). Vakharia cannot prevail if SCH "honestly believed in the nondiscriminatory reason[ ] it offered, even if the reason[ ][is] foolish or trivial or even baseless." *Hartley*, 124 F.3d at 890; *Wolf v. Buss (America), Inc.*, 77 F.3d 914, 919 (7th Cir.1996). The bottom line: Vakharia has failed to show that SCH's explanation for the suspension of her privileges—that the quality of her care was substandard—was less than honest. Specifically, she has failed to raise a genuine issue that the committee was not acting in good faith reliance on the ASA report.[11] Vakharia calls into question the objectivity of the committee, but she fails to point to any direct evidence of bias.

10. During her first cross-examination of Wender, Vakharia made some attempt to question Wender's findings regarding specific cases. However, at that time, Wender appeared ill-equipped to engage in such a detailed discussion. In contrast, when Wender returned on a subsequent date for further, lengthy cross-examination, Vakharia failed to pose any questions about specific cases. The record shows that, at several junctures, committee members intervened and suggested that Vakharia direct her cross-examination to specific cases. Heller also conducted a limited cross-examination of Wender in which Wender gave relatively detailed answers to the few questions that related to specific cases.

11. Because Vakharia's claims accrued before the enactment of the Civil Rights Act of 1991, *see* 42 U.S.C. § 2000e–2(m), the district court also considered the case under the mixed motives standard articulated in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 242, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). While we need not address this issue, we note that the mixed motives inquiry is essentially the flip side of the pretext coin. Under *Price Waterhouse*, even if some or all of the appellees had been motivated by discrimination, they would not be liable if they could prove that the termination of Vakharia's privileges was based on a reasonable belief in the inadequacy of the quality of her care.

There is no doubt that the peer review process was mired in contention; the record is replete with exchanges (often heated) between Vakharia, her attorneys and her husband, on the one hand, and members of the committee, on the other, mainly in the context of disputes over procedural matters. But we can see nothing in the record that would suggest that Vakharia was denied the procedural safeguards generally associated with an internal review process. On the contrary, the 19 days of hearings—running to 3130 pages of transcript—suggest that the committee conducted an unmistakably lengthy and comprehensive inquiry.

■ In conclusion, we affirm the district court's decision to enter summary judgment in favor of the defendants and against Vakharia on her § 1981 claims. And since Vakharia cannot survive summary judgment on her § 1981 claims, her § 1985 claim also fails. *See Stevens v. Tillman*, 855 F.2d 394, 403–04 (7th Cir. 1988) (noting that the statute does not create any substantive rights and that a "plaintiff must locate a right independently secured by state or federal law").[12]

*Sherman Act*

■ Vakharia also appeals the district court's grant of summary judgment in favor of the appellees on the Count VI antitrust claim. Section 1 of the Sherman Act prohibits concerted anticompetitive activities—including conspiracies—designed to unreasonably restrain trade. *See* 15 U.S.C. § 1. The essence of Vakharia's claim is that SCH and the ASA (and various individuals associated with these entities) engaged in a conspiracy to purge anesthesiology departments of foreign medical graduates. Vakharia contends that the ASA's independent on-site review process provided a convenient mechanism whereby hospitals such as SCH could remove foreign medical graduates on performance-related grounds.[13]

■ The fate of this issue is foreshadowed by our discussion of Vakharia's employment discrimination claims: just as the inadequacy of the quality of her care justified the termination of her hospital privileges, so it provides a defense to the claim of an antitrust conspiracy. We have noted the absence of evidence that would challenge the *ad hoc* peer review committee's purported good faith reliance on the ASA report. Vakharia has not produced any evidence demonstrating that the ASA review process was tainted or, specifically, that the ASA conspired with individuals at SCH to weed foreign graduates out of the anesthesiology department. In other words, Vakharia has failed to show that SCH and ASA were engaged in unlawful concerted activity. *See Serfecz v. Jewel Food Stores*, 67 F.3d 591, 599 (7th Cir. 1995). Thus, we endorse the district court's determination that the appellees

**12.** The district court also granted summary judgment in favor of SCH on the Count IV state law claim of violation of provisions of the SCH bylaws. Recognizing that "Illinois law, both statutes and cases, reflects a significant hesitation about intruding into the peer review process," the district court held that there was no proof of a substantial violation or any actual unfairness in the peer review process. Mem. & Ord. Nov. 18, 1997, Appellant's Br. at A21. The court also rejected Vakharia's other allegations of bylaw violations—notably in relation to Loeber's practices regarding designation of status and assignment of cases—citing, first, a reluctance on the part of the courts to review these types of practices and, second, Vakharia's failure to prove the allegations of discrimination that lie at the heart of her suit. Vakharia's appeal and reply briefs touch upon this issue in passing although the extent of her claim on appeal is by no means clear. She appears to focus her objections on the district court's rejection of her "right to be free from discrimination under the bylaws." Appellant's Br. at 40. We believe that the district court handled the issue appropriately, and we endorse its conclusion that the claim of discrimination in violation of the bylaws goes hand-in-hand with her federal discrimination claim.

**13.** Vakharia argues that she was denied valid requests to conduct additional discovery with respect to her Sherman Act claim. However, bearing in mind the voluminous discovery which took place in this case, we believe that the district court acted within its discretion in this regard.

are entitled to summary judgment on Count VI.[14]

AFFIRMED.

14. Vakharia also appeals the district court's denial of leave to file a fourth amended complaint to add state law claims for defamation, false reporting and commercial disparagement. The request came three years after the initial complaint was filed and at the stage when substantial discovery had been completed. In the circumstances, the district court did not abuse its discretion in denying Vakharia's motion on grounds of undue delay and substantial prejudice to the defendants. *See Speer v. Rand McNally & Co.*, 123 F.3d 658, 665 (7th Cir.1997); *Sanders v. Venture Stores, Inc.*, 56 F.3d 771, 774–75 (7th Cir.1995).