**Joel J. KINLOW and TV–49, Inc.,**
**Plaintiffs–Appellants,**

v.

**CITY OF MILWAUKEE,**
**Defendant–Appellee.**

No. 00–3159.

United States Court of Appeals,
Seventh Circuit.

Argued March 6, 2001.

Decided March 16, 2001.

Before FAIRCHILD, CUDAHY, and RIPPLE, Circuit Judges.

ORDER

Mr. Joel Kinlow, an African–American, and Mr. Kinlow's company, TV–49, Inc. ("TV–49"), filed this suit under 42 U.S.C. §§ 1981 and 1983 alleging that the City of Milwaukee ("the City") discriminated against them based on race by denying a building permit for a television tower. The district court granted the City's motion for summary judgment, and Mr. Kinlow and TV–49 now appeal. We affirm.

I. *Background*

Mr. Kinlow, who is the president and sole shareholder of TV–49, has operated a television station since 1991 using a broadcast tower located in Oak Creek, Wisconsin. Desiring to become more competitive in the Southeastern Wisconsin television market, Mr. Kinlow asked Mr. Albert Dzierzak, a planning examiner for the City's Department of Building Inspection ("DBI"), what procedures he should follow to build a new television tower in Milwaukee. Mr. Dzierzak informed Mr. Kinlow that he should purchase land in Milwaukee's industrial area, obtain a survey, and apply to DBI for a permit to build the tower. Based on this information, Mr. Kinlow secured an option to purchase land at 3872 North Fratney Street in Milwaukee and procured a survey plan of the property. Mr. Kinlow did not condition the purchase of the property on his ability to obtain the federal and local permits necessary to build a broadcast tower.

A. Mr. Kinlow's Efforts to Obtain a Local Construction Permit.

In April or May of 1995, Mr. Kinlow presented his survey plan to Mr. Dzierzak. Mr. Dzierzak informed him that there would not be a problem in obtaining a permit to construct a television tower on the property. Consequently, Mr. Kinlow obtained approval to build the tower on that site from the Federal Aviation Administration ("FAA") and the Federal Communications Commission ("FCC"). He avers that the cost of obtaining these federal

permits totalled $10,000 in engineering and legal fees. After receiving the FCC's approval in September 1996, Mr. Kinlow purchased the property for $210,000. He again contacted Mr. Dzierzak, who informed him that he would need to obtain soil samples and tower footing plans to receive a local permit.[1] According to Mr. Kinlow, the cost of obtaining these plans totaled another $10,000. Mr. Kinlow presented the soil and tower footing information to Mr. Dzierzak in March 1997, and an engineering firm provided additional information regarding the site in April 1997.

Sometime later that April, Mr. Kinlow went to DBI to apply in person for the permit. Unfortunately Mr. Dzierzak was out sick and so Mr. David Kakatch, another planning examiner at DBI, reviewed Mr. Kinlow's application. Mr. Kakatch refused to grant the building permit and referred the application to Milwaukee's Board of Zoning Appeals ("the Board") because he believed the proposed tower, which would be 1,053 feet high, would be too close to an adjoining building according to Milwaukee Code of Ordinances section 295–19–8–a. Section 295–19–8–a provides that "[n]o structure other than related accessory structures shall be located within a circle having the transmitter tower as its center and a radius equal to 20% of the height of the tower or 100 feet whichever is greater."

## B. Mr. Kinlow's Appeal to the Milwaukee Board of Zoning Appeals

In May 1997, Mr. Kinlow appealed the denial of his permit to the Board and requested a variance from the ordinance prohibiting the construction of broadcast towers near buildings located within a radius of 20% of the proposed tower's height. On June 5, a zoning specialist at DBI informed Mr. Kinlow by letter that the board was processing his application for a variance. In the letter, the zoning specialist cited the necessity for the variance, explaining that "the distance between the proposed tower and the existing buildings does not meet the dimensions that are required by the Zoning Code," because "there appears to be 4 buildings located within 210.6 ft. of proposed tower," and "one building is located within 4.66 ft of this tower."

## 1. Testimony from the Department of City Development

On July 31, 1997, the Board held a hearing on the variance request. At the hearing, a representative of Milwaukee's Department of City Development ("DCD") testified that his Department "vehemently" opposed the variance request. The DCD representative explained that several buildings near Mr. Kinlow's proposed tower were situated within 20% of the height of the tower. Next, the representative noted that the proposed tower would be located only 151 feet away from an apartment building, even though a Milwaukee ordinance prohibits the construction of a tower within 150 feet of a residence. The representative also expressed concern that during the winter, ice could fall off the towers, thereby hurting residents or patrons of the nearby Pick N Save store which was located within 150 feet of the proposed tower.

---

1. Mr. Dzierzak explained at a deposition taken for this lawsuit that to the best of his recollection, Mr. Kinlow never filed a formal application for the tower, and that after "a couple of times on the phone" with Mr. Kinlow, Mr. Dzierzak impatiently reminded him that in order to get a permit, he had to file his papers with DBI. At the deposition, Mr. Dzierzak also confirmed that he was prepared to issue the permit as soon as Mr. Kinlow formally applied for it.

### 2. The Transmission Tower Policy Statement

During his testimony at the hearing, the representative also commented that the proposed tower would not comply with a policy objective, formally passed by the Milwaukee Common Council on March 21, 1997, entitled "the Transmission Tower Policy Statement." The "Transmission Tower Policy Statement" provides that the "policy on the placement of transmission towers can serve as a reference tool and guide for the Board of Zoning Appeals, the City Plan Commission, City Building and Zoning staff, and other City bodies and officials responsible for making decisions about the placement of transmission towers in the City of Milwaukee." Milwaukee, Wis., Substitute Resolution Approving a "Transmission Policy Statement" As Part of the Comprehensive Plan of the City of Milwaukee (March 21, 1997). According to the representative, Mr. Kinlow's tower did not meet the goals of the policy ordinance because the tower was not designed to accommodate multiple users, was not aesthetic, and Mr. Kinlow had not proposed to landscape the area surrounding the tower. Furthermore, the representative said, Mr. Kinlow's tower did not comply with the policy goal that broadcast towers should serve the entire Milwaukee metropolitan area, and therefore should not be concentrated in the city.

### 3. Mr. Kinlow's testimony

After hearing this testimony, the Board questioned Mr. Kinlow about his unsuccessful efforts to mount his antenna on an already existing broadcast tower and his thwarted attempts to comply with the Transmission Tower Policy Statement's goal of encouraging multi-user towers. At no point during this discussion did Mr. Kinlow indicate that his proposed tower was capable of carrying more than one antenna. Mr. Kinlow also argued that he should be granted the variance due to his reliance on Mr. Dzierzak's multiple assurances that obtaining a permit for the tower would not be a problem. Additionally, he expressed concern about the large amount of money (over $200,000) he had expended based on Mr. Dzierzak's representations about the ability to obtain a local permit. Mr. Kinlow conceded, however, that he never received written approval from Mr. Dzierzak and that he obtained the FCC and FAA permits without first applying for the local permit.

### 4. Other objections to the proposed tower

The Board also considered objections to the proposed tower from a representative of a Milwaukee alderman and from owners of property near the proposed site. The objectors explained that three other towers presently existed in the neighborhood and voiced concern that the area would become a "tower farm," causing a decline of nearby property value. In addition, the objectors expressed their worries regarding the safety of the tower. Nevertheless, as Mr. Kinlow's attorney pointed out during the hearing, none of the objecting neighbors owned property located inside the 20% of tower height radius and none of the owners of land directly adjoining Mr. Kinlow's property objected to the proposed tower.

### 5. The Board's decision

After deliberating openly at the hearing, the Board concluded that Mr. Kinlow's proposed tower did not comply with the "Tower Policy Statement," and that nearby property owners would suffer a detriment to the enjoyment of their land due to safety concerns and a decrease in property values. In addition, the board decided that although Mr. Kinlow would suffer a hardship without the variance based on his

expenditure of over $200,000 to secure the property, that hardship was self-imposed and purely economic (which, a board member commented, is a prohibited basis for granting a variance). Accordingly, the board denied the variance. Mr. Kinlow appealed the decision to the Milwaukee County Circuit Court, and the Circuit Court affirmed the board's decision to deny the variance.

### C. Mr. Kinlow and TV–49's Federal Lawsuit

Mr. Kinlow and TV–49 subsequently filed this suit, first asserting a claim under § 1983 that the permit to construct the tower was denied without due process of law in violation of the 14th Amendment. They also raised a claim under § 1981, alleging that the denial of the permit constituted race discrimination. The City moved for summary judgment. The district court granted the motion, concluding that Mr. Kinlow and TV–49 failed to demonstrate that, as a matter of law, they had a property right to the permit which invoked the protection of due process. The court also denied Mr. Kinlow and TV–49's claim under § 1981, reasoning that Mr. Kinlow and TV–49 did not produce evidence showing that other television companies that had received permits were members of a non-protected class or were similarly situated to Mr. Kinlow and TV–49. Mr. Kinlow and TV–49 now appeal.

### II. Analysis

Preliminarily, we note that in this appeal Mr. Kinlow and TV–49 do not identify the statutory basis for their race discrimination claim. Mr. Kinlow and TV–49's complaint contains two counts: a claim under § 1983 alleging that the City denied the permit without due process of law, and a claim under 42 U.S.C. § 1981, alleging that the City denied the permit because Mr.

Kinlow is an African–American, and TV–49 is an African–American owned broadcast station. The City and the district court treated these claims as the sole claims raised in the complaint, and Mr. Kinlow and TV–49 have not objected to the City's or the district court's characterization of the complaint.

■ On appeal, however, Mr. Kinlow and TV–49 seem to recast their race discrimination claim as an equal protection claim by arguing that under *Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 264–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), an equal protection case, record evidence supports an inference of race discrimination. Regardless, for purposes of applying the appropriate legal standard to review the judgment on their general race discrimination claim, it does not matter whether Mr. Kinlow and TV–49 are arguing that the City's actions violated equal protection or § 1981; to survive summary judgment on either type of claim, a plaintiff must demonstrate that similarly situated persons in an unprotected class were treated differently. *See McPhaul v. Board of Comm'rs*, 226 F.3d 558, 564 (7th Cir.2000) (equal protection claims); *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 806 (7th Cir.1999), *cert. denied*, 530 U.S. 1204, 120 S.Ct. 2197, 147 L.Ed.2d 233 (2000) (claims under § 1981).

■ In its order granting summary judgment, the district court explained that other broadcasting companies to receive tower construction permits were not similarly situated to Mr. Kinlow and TV–49 because those companies "dealt with different plan examiners and were not subject to the 1997 transmission tower policy statement ." We agree with the district court that Mr. Kinlow and TV–49 did not produce evidence that other broadcasting companies were similarly situated and thus

they failed to make a prima facie case of either an equal protection claim, *see McPhaul* 226 F.3d at 564, or a claim under § 1981, *see Vakharia,* 190 F.3d at 806.

Mr. Kinlow and TV–49 assert that three other broadcasting companies were treated differently because they received permits to build television stations: Channel 58, Channel 24, and Channels 10–36.[2] But Mr. Kinlow and TV–49 failed to produce evidence that would lead a trier of fact to conclude that any of these companies were similarly situated.

In June 1996, the Board granted Channel 58 (Weigel Broadcasting) permission to construct a tower in Milwaukee. Although the permit was granted approximately eight months before the Milwaukee City Council passed the Transmission Tower Policy Statement, the Board conditioned the construction of the tower on the requirement that the tower could hold at least three other antennas. Therefore, Channel 58 was not similarly situated to TV–49 because Channel 58 applied for the permit before the institution of the Policy Statement and because the company agreed to construct the tower to accommodate multiple users. *See Radue v. Kimberly–Clark Corp.,* 219 F.3d 612, 617 (7th Cir.2000) (when assessing whether parties are "similarly situated," a court must examine "all relevant factors" including whether the parties were subjected to the same standards).

Similarly, Channels 10–36 (the Milwaukee Area Technical and Adult Education District or "MATC") was granted a permit to construct a tower after the Board held a hearing regarding the proposed site. According to a City representative at the hearing, the proposed tower had the capacity to carry up to 100 broadcast stations. The City approved the permit to build the tower based primarily on the proposed tower's ability to comply with the Transmission Tower Policy Statement's goal to accommodate multiple users on a single tower.

With respect to Channel 24 (B & F Broadcasting), Mr. Kinlow and TV–49 contend that the company was granted a variance to build a single antenna television tower even though the tower, like Mr. Kinlow's proposed tower, did not comply with the then-existing ordinance requiring broadcast towers to be located a certain number of feet from existing structures. Despite this admittedly different treatment accorded to Channel 24, TV–49 and Channel 24 are not similarly situated in all respects. The City granted Channel 24 the permit to build its tower on February 20, 1975, over twenty years before the adoption of the Transmission Tower Policy Statement. Therefore, unlike TV–49, Channel 24 was not subject to the Tower Policy Statement's goal of encouraging multiple user broadcast towers. Furthermore, the City produced unrefuted evidence showing that none of the City officials who granted the variance to Channel 24 in 1975 were involved in the decision to deny Mr. Kinlow's application for a permit in 1997. *See id.* at 618 (When "different decision-makers are involved, two decisions are rarely similarly situated in all

---

**2.** In Mr. Kinlow and TV–49's complaint, they allege that the City also granted Channel 18 a permit to build a broadcast tower. Besides this singular mention of Channel 18, the parties have not discussed the corporate identity of the station, have not produced record evidence regarding the station, and have not explained when the station received a permit to construct a tower. We therefore lack any informational basis to discuss whether Channel 18 was similarly situated, and deem the issue waived. *See Pond v. Michelin North America, Inc.,* 183 F.3d 592, 597 (7th Cir. 1999) (declining to consider an issue insufficiently developed in the district court).

relevant respects." (internal quotations and citations omitted)).

Additionally, the City also produced evidence showing that the Board relied on the Transmission Tower Policy Statement to deny the permit application of another broadcast company, Channel 12 or WISN. In that application, Channel 12 simply requested to extend the height of its already existing tower by 116 feet.

In sum, Mr. Kinlow and TV–49 produced no evidence showing that they were treated differently and denied a permit based on race, while other broadcasting companies received permits even though the companies did not comply with the City's regulations. With regard to the "similarly situated" requirement, Mr. Kinlow and TV–49 merely assert that other television companies were similarly situated because Mr. Kinlow "obtained the necessary authorizations from the federal agencies and followed all of the requirements of the City to obtain a permit." But Mr. Kinlow and TV–49 ignore the City's evidence that other broadcasting companies that received permits did so either with the permission of completely different decision makers long before the 1997 Transmission Tower Policy Statement, or in compliance with the Tower Policy Statement. Mr. Kinlow and TV–49 unsuccessfully attempt to distinguish their case from the cases regarding whether a plaintiff is similarly situated by pointing out that those cases concern employment discrimination. But this court uses the same framework to analyze employment discrimination claims, claims under § 1981, and equal protection arguments. *See McPhaul,* 226 F.3d at 566, n. 6 (§ 1983 and Title VII cases examined under the same standard); *Vakharia,* 190 F.3d at 806 (employment discrimination and § 1981 claims analyzed under the same standard); *Riordan v. Kempiners,* 831 F.2d 690, 695–96 (7th Cir.1987) (same

methods of proof utilized in Title VII and equal protection cases). Accordingly, the grant of summary judgment to the City was proper.

On a final note, Mr. Kinlow and TV–49 also cite *Freeman v. Burlington Broadcasters, Inc.,* 204 F.3d 311 (2nd Cir.2000), for the proposition that because Mr. Kinlow obtained authorizations from the FAA and the FCC to build the tower, the City of Milwaukee is preempted from denying the permit. The Second Circuit's *Freeman* decision, which concerns the ability of local zoning board to regulate radio frequencies, does not discuss preemption of a local zoning authority's power to limit the number of broadcast towers in a city or to keep towers distanced from pre-existing structures. Rather, *Freeman* holds that federal communications law preempts a local zoning authority's ability to condition the grant of a broadcast tower construction and use permit on a radio frequency interference requirement. *Id.* at 325. Because in this case the City's denial of Mr. Kinlow's application had nothing to do with the regulation of broadcast frequency interference, the *Freeman* case is inapplicable.

### III. *Conclusion*

Because Mr. Kinlow and TV–49 have not demonstrated that the broadcast companies who were granted permits to build broadcast towers were similarly situated to Mr. Kinlow and TV–49, we AFFIRM the district court's grant of summary judgment to the City.