In the

# United States Court of Appeals
### For the Seventh Circuit

No. 04-3559

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

*Plaintiff-Appellant*,

*v.*

TARGET CORPORATION,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 02 C 0146—**Rudolph T. Randa**, *Chief Judge*.

ARGUED SEPTEMBER 20, 2005—DECIDED AUGUST 23, 2006

Before CUDAHY, KANNE, and ROVNER, *Circuit Judges*.

CUDAHY, *Circuit Judge*. The Equal Employment and
Opportunity Commission (EEOC) filed a Complaint against
Target Corporation (Target) in the district court
on February 8, 2002. The EEOC charged that Target
violated Title VII of the Civil Rights Act of 1964 (The Act),
42 U.S.C. § 2000e *et seq*., by engaging in race discrimination
against African-American applicants for managerial
positions. The EEOC also alleged that Target violated the
Act when it failed to make and preserve records relevant to
the determination whether unlawful employment practices
had been, or were being, committed. On July 1, 2003, both
parties brought motions for summary judgment. On August

2, 2004, the district court denied the EEOC's motion, granted Target's motion in its entirety, and dismissed the action. The EEOC now appeals. We reverse and remand for further proceedings.

# I. Background

## A. Target's Structure

Target Corporation is headquartered in Minneapolis, Minnesota. One of its retail divisions is Target, a discount chain of more than 1,100 stores nationwide. Target organizes its operations by Groups, and the Groups are divided into districts. This case involves District 110 in Group 192. Group 192 is made up of Target Districts in several southern Wisconsin and northern Illinois counties. District 110 is made up of stores in the Madison, Milwaukee, and Waukesha, Wisconsin metropolitan areas.

Each district is managed by a District Team Leader, and each store is managed by a Store Team Leader (STL), who is assisted by Executive Team Leaders (ETLs). Each ETL is responsible for a different area of store operation. Most stores have the following ETLs: a Guest Services ETL, who manages the front end of the store, including cashiers and returns; a Hardlines ETL, who manages the dry goods section of the store; a Softlines ETL, who manages the clothing and jewelry section of the store; a Team Relations ETL, who manages the store's human resources functions; and a Logistics ETL, who manages the stockroom of the store.

## B. Hiring Process for ETLs

In the first step of the ETL hiring process, Target prescreens applicants to determine if they meet the minimum qualifications for the position. Target does not specify the

credentials an applicant must have to pass the pre-screening, but factors such as education, professional experience and retail-related experience are considered. Target also generally requires that an applicant have either a college degree or significant management experience. If the recruiter determines that an applicant meets Target's minimum standards for an ETL position, the recruiter will contact the applicant to schedule an initial interview. This interview is usually conducted by telephone, but may take place at a Target store. During this interview, each applicant is asked the same or similar questions, which are designed to determine if the applicant meets the minimum standards for an ETL position.

Before February of 2001, applicants who performed well in the initial interview were invited to attend an "ELITE" interview. The ELITE interview procedure had two parts: first, a written test called a PDI, and second, three rounds of one-on-one personal interviews. Target restructured this procedure in 2001.

The PDI is a standardized multiple-choice test that is used to evaluate the leadership ability of applicants. Target does not look at the actual score an applicant receives, but instead assigns the applicant a color code, which indicates a range in which the applicant scored. A green score indicates that the applicant scored well, a yellow score indicates an applicant obtained a satisfactory score and a red score indicates an applicant scored poorly. Target claims that a green or yellow score is a prerequisite for an applicant's hiring, but such a score does not guarantee employment.

An applicant's performance in the interview round is weighted more heavily than the PDI test performance. During the ELITE interview round, Target executives perform one-on-one interviews with applicants. The executives use an interview guide which contains questions that

are designed to evaluate the applicants' leadership abilities. All applicants are asked the same questions. The applicants' answers are scored using set guidelines. The interviewers then assign a total score for each applicant.

After the one-on-one interviews are completed, the interviewers have a consensus meeting to discuss all applicants. Target claims that the total scores of the applicants are used only as a guide in hiring and that applicant's scores are not directly compared. Thus, the interviewers may choose to hire an applicant who had a total score that was lower than another applicant not chosen.

## C. Individual Claims—Charging Parties

This case involves a group of individuals who claim that they were not hired in Target's ETL hiring process because of their race. First, in early 2000, James Daniels, Jr., an African-American, applied to Target for an ETL position in District 110. He interviewed for an ETL position on March 13, 2000. Daniels did very well on his PDI test, scoring higher than ninety-seven percent of the candidate norm group. Target did not hire Daniels. Target claimed he did not meet the requirements for an ETL position based on his ELITE interview, but did not produce the ELITE interview forms for Daniels and did not explain how he failed to meet those requirements.

The claims of the three other individuals in this case, Kalisha White, Ralpheal Edgeston and Cherise Brown-Easley involve their contact with STL Matthew Armiger. Before February of 2001, District 110 had a district recruiter. When the district recruiter position was eliminated, STL Richard Walters, who was temporarily assigned recruiting duties, asked fellow STL Armiger for help with those duties. At that time, Armiger was managing a newly-opened and short-staffed Target store in New Berlin,

Wisconsin. Walters and Armiger initially shared the recruiting duties equally, but later Armiger's duties were scaled back. Armiger testified that he believed his recruiting duties were secondary to his management of the store.

### 1. Kalisha White

Kalisha White, an African-American who attended Marquette University, emailed Target her resume for an ETL position on February 20, 2001, while she was still a student at Marquette. White's resume indicated that she was a member of Alpha Kappa Alpha, an African-American sorority. Armiger e-mailed White and asked her to call to set up an interview. White called at least twice, but each time she spoke with Armiger he said he was too busy to schedule an interview.

White became suspicious of Armiger and decided to conduct an experiment to determine if he had discriminated against her because of her race. Thus, on May 9, 2001, she submitted a resume to Armiger under a fictitious name, "Sarah Brucker." White used her own telephone number, and gave Brucker a Brookfield, Wisconsin, address. She believed the address was located in a predominantly Caucasian neighborhood. Armiger testified that White had a stronger resume than Brucker because White was pursuing an MBA degree, while Brucker was not. On May 10, 2001, Armiger emailed and called Brucker, asking her to return his call. White had a Caucasian acquaintance call Armiger and pretend to be Sarah Brucker. Armiger scheduled an interview with Brucker during their conversation. White testified that she called Armiger soon after Brucker's conversation with him, but he said that he was too busy to schedule an interview with her.

### 2. Ralpheal Edgeston

Ralpheal Edgeston received an email from Armiger on March 2, 2001, in which Armiger asked her to call and schedule an interview. Edgeston, an African-American student at Marquette University, had submitted her resume to Target for an ETL position at a multicultural job fair held at the University of Wisconsin-Milwaukee in the previous month. Edgeston's resume indicated that one of her college majors was African-American studies and, like Kalisha White's resume, that she was a member of the Alpha Kappa Alpha sorority, which Armiger testified to knowing was an African-American sorority. Additionally, her resume listed that she was a member of the National Association for the Advancement of Colored People (NAACP). Edgeston called Armiger and scheduled a phone interview for March 4, 2001; however, Armiger did not call Edgeston at the appointed time and did not return her calls after that date. Target never scheduled another interview with Edgeston.

### 3. Cherise Brown-Easley

Class member Cherise Brown-Easley, an African-American, also submitted her resume to Target at the University of Wisconsin-Milwaukee multicultural job fair in February 2001. Brown-Easley's resume indicated that she was a member of the "Metropolitan Alliance of Black School Educators." Brown-Easley received an email from Armiger requesting that she call Armiger to schedule an interview. She called Armiger and scheduled an interview for March 4, 2001. Armiger did not contact Brown-Easley at the appointed time. Instead, Brown-Easley called Armiger a half hour after the interview time, and after being informed that he had left for the day, she left a message for him. The following day, she left another message for Armiger, but she never heard back from him.

During the week that Armiger failed to contact Edgeston and Brown-Easley, he was scheduled to interview nine ETL applicants. In addition to Edgeston and Brown-Easley, Armiger also failed to contact two Caucasian applicants. However, Target later interviewed at least one of the two Caucasian applicants, but Edgeston and Brown-Easley were never interviewed.

Armiger testified that he did not know the race of White, Edgeston, or Brown-Easley during the recruiting process. Armiger could not recall reviewing White or Brown-Easley's resumes. He also claimed he did not study Edgeston's resume closely enough to determine her race.

### D. Target's Record Retention

Also at issue in this appeal is Target's practice of employment record retention. During the spring of 2001, Store Team Leader Walters estimated that he received 200 resumes for ETL positions, and that Armiger reviewed thirty percent of them, or about sixty resumes. In the fall, slightly fewer resumes were submitted, and in other months, about ten to twenty-five resumes were submitted each month. Armiger admitted to throwing out the resumes of applicants he deemed unqualified, including those of White, Edgeston and Brown-Easley, rather than retaining them as required by law and by Target's document retention policy. Armiger claims he threw out the resumes to protect the applicants' privacy.

In an effort to comply with the EEOC's document retention requirement, Target currently uses Brass Ring, a nationwide employment recruitment website, to store applicant documents, including: copies of applicants' resumes, applicants' PDI test results and completed ELITE interview forms. Target recruiters who receive the resumes submit them to Brass Ring and make copies of the resumes of the candidates they plan to interview. The Brass Ring

system does not store information regarding the district where the applicant applied or whether the position applied for was an ETL position.

Target also has several policies to ensure that job applications and related documents are retained for the required time. Target uses its corporate intranet and email messages to share its record retention policies with STLs. The human resource managers meet biannually to audit each Target store, to conduct training and to remind employees of the record retention policy. The human resource managers instruct on-campus recruiters to retain all resumes, applications and interview guides and notes, and to route the documents to the national headquarters. Finally, the ETL for Team Relations is responsible for ensuring that the record keeping policy is being followed at each Target store.

The success of Target's record retention program through Brass Ring has been disputed. There is some indication that all employees are not following the program. As discussed above, STL Armiger threw out resumes that he should have retained. Additionally, Virginia Schomisch, the District Team Leader's administrative assistant, testified in June of 2003 that she does not send applicant documents to Brass Ring, but instead she retains them herself for the required time. According to Target, the recruiters who send documents to Schomisch also send them to Brass Ring. While Target's policy does not include a provision to ensure that relevant documents are retained from the time a discrimination charge is filed until that case is fully concluded, Target claims to address this requirement on a case by case basis, notifying employees to retain documents when a charge arises.

## E. The EEOC's Investigation

On May 11, 2001, White and Edgeston filed EEOC discrimination charges against Target. White alleged that

Target had discriminated against her and black applicants as a class by not considering them for ETL positions. Edgeston's charge alleged that Target had discriminated against her because of her race.

The EEOC investigated the applicants' claims against Target. The EEOC issued a letter of determination for White and Edgeston's charges on September 13, 2001, finding reasonable cause to believe Target had discriminated against the applicants on the basis of their race. The EEOC also issued a letter of determination for a charge filed by Keith Stanley on January 8, 2001. Stanley's claim is not at issue in this appeal. The EEOC alleged that Target discriminated against the African-American applicants based on their race by refusing to hire them for ETL positions in District 110 since March 14, 2000.

The EEOC also alleged that since at least March 14, 2000, Target has violated Section 709(c) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-8(c), by failing to make and preserve records relevant to the determination of whether Target is or has engaged in unlawful employment practices.

The EEOC attempted to facilitate a conciliation between Target and the applicants, but after four months of negotiations, they were unable to reach an agreement. The EEOC then filed its complaint in this lawsuit.

### F. District Court's Action & Findings

At the district court, Target moved for summary judgment on the EEOC's complaint. The EEOC moved for partial summary judgment on its records retention violation claim and on the other affirmative defenses that Target asserted.

The district court issued its Decision and Order on August 2, 2004. The court denied the EEOC's motion for partial

summary judgment on its records retention violation claim and granted Target's motion for summary judgment on this issue. The court found that Target's new Brass Ring program complied with the law, so an injunction (which the court noted was the only available remedy for such a claim) was unnecessary. The court also held that, although Target could not produce the recruitment records, the EEOC was not entitled to an inference that the documents would have contained information adverse to Target's case because the EEOC did not present evidence that Target employees disposed of the documents in bad faith.

The court granted Target's motion for summary judgment on the EEOC's Title VII disparate treatment claims, and denied the EEOC's motion on these claims. The court found that Armiger's failure to respond to applicants White, Edgeston and Brown-Easley was explained by the fact that he was busy managing his store. Therefore, according to the court, Target met its burden of producing a legitimate nondiscriminatory reason for its actions, as required by the *McDonnell Douglas* test, and the burden shifted back to the EEOC. Since the EEOC did not, in the district court's opinion, show that Target's proffered reason was a pretext for an actual discriminatory reason, the court granted Target's motion for summary judgment. In the district court, Daniels was an unnamed class member. With respect to his claim, as well as others, the court found that the EEOC failed to show that Target's reason for not hiring him was merely a pretext for discrimination.

## II. Discussion

### A. Record Retention

The district court denied the EEOC's motion for summary judgment and granted Target's cross motion for summary judgment. The district court found that the only possible remedy in this situation, a violation of 42 U.S.C. § 2000e-

8(c), is injunctive relief. We review a district court's grant of summary judgment *de novo*, thus we review *de novo* the conclusion that an injunction was not necessary to prevent Target from violating the EEOC's record keeping regulations in the future. *See United States v. Raymond*, 228 F.3d 804, 810-11 (7th Cir. 2000), *cert. denied*, 533 U.S. 902 (2001) (reviewing *de novo* the grant of a permanent injunction in the context of summary judgment). Summary judgment should only be granted if the record shows that there is no genuine issue of any material fact. Fed. R. Civ. P. 56(c). When making such a determination a court must draw all reasonable inferences in favor of the non-moving party. *Raymond,* 228 F.3d at 810.

### 1. Brass Ring

Under Title VII, employers are required to "make and keep such records relevant to the determinations of whether unlawful employment practices have been or are being committed." 42 U.S.C. § 2000e-8(c). The EEOC's record keeping regulations require that employers retain applications and other documents related to hiring for one year. 29 C.F.R. § 1602.14. Additionally, if a charge of discrimination has been filed, an employer is required to retain all relevant personnel records until the final disposition of the charge. *Id.*

On appeal, the EEOC contends that the district court erred when it denied its motion for summary judgment on Target's record keeping violations and when it granted Target's motion for summary judgment on that same claim. We find that the district court erred in concluding that no genuine issue of material fact existed as to whether an injunction is necessary to correct Target's record keeping violations.

While we agree that Target has put forth evidence that it has revised its record retention policies in an effort to

comply with Title VII, we do not agree that such changes ensure "on [their] face" that Target will not commit further violations. *See Equal Employment Opportunity Comm'n v. Target Corp.*, No. 02-C-0146, slip op. at 11 (E.D. Wis. 2004). The reforms chosen do not address the particular problems that allowed violations to occur. Individual recruiters and administrative personnel destroyed records that were supposed to be retained because they did not know that they must retain them. In support of these allegations, the EEOC invoked the testimony of Virginia Schomisch, the person responsible for retaining employment documents for all of Target's District 110 applicants, who said that she did not know that she was required to retain an applicant's documents for more than one year if that applicant files a charge with the EEOC. Additionally, Armiger failed to retain the records of the individual claimants in this suit and admitted that he destroyed records that should have been retained.

Assuming that Armiger did not destroy employment documents in bad faith, his claim that he did not know he needed to retain these documents is problematic. Target's old record keeping policy consisted of informing STL Richard Walters that he needed to retain documents and of conducting annual personnel file audits. Target claims that it has mitigated the risk of untrained personnel destroying documents by reiterating its policy on retention in emails to STLs, biannual audits and communication through ETLs in charge of compliance. A reasonable finder of fact could conclude, however, that Target's new policy of retention is not substantially different from the old policy. Since Target claims that its old policy could have allowed Armiger to recruit without knowing that he must retain recruitment documents, a reasonable fact finder could conclude that its new policy likewise will not prevent recruiters from being ill-informed. While Target has assigned ETLs for Team Relations to ensure that each store is retaining documents

(either onsite or with Brass Ring) in compliance with Target's record keeping policy, a reasonable finder of fact might question whether this assignment will be sufficient if, for example, an STL (an ETL's superior) is assigned to help with recruiting in the same way that Armiger was assigned in early 2001. Thus, we find there is a genuine question of material fact as to whether Brass Ring has truly reformed Target's record retention policy in such a way as to ensure that violations will not continue.

### 2. Bad Faith

The EEOC claims that Armiger knew that he was supposed to retain the application documents of Cherise Brown-Easley, Kalisha White and Ralpheal Edgeston but did not do so, and that this knowing failure is evidence of bad faith document destruction. Upper level managers were told numerous times to retain resumes and employment documents, and indeed, Dawne Carlson, the Regional Human Resources Manager for District 110, testified that Armiger should have known better than to destroy resumes. Target argues that, just because Armiger should have known better than to destroy resumes, does not mean that he did know better, but this only underscores that this is a genuine issue of material fact to be resolved at trial. It is disputed whether or not Armiger knew not to destroy resumes, but if he did know better and destroyed the resumes nonetheless, a reasonable fact finder could infer that he did so for a dishonest reason and in bad faith. The record evidence does not provide enough information for the question of bad faith to be resolved, but viewing all evidence in the light most favorable to the EEOC, there is certainly a genuine issue of material fact as to whether Armiger destroyed the resumes in bad faith.

If Armiger did destroy the documents in bad faith, it underscores the necessity for there to be further investiga-

tion into whether an injunction is necessary to prevent further acts of bad faith by other Target employees. If Target did not sufficiently prevent bad faith destruction of employment documents in the past, it should adopt some policy to prevent their destruction in the future. *United States v. Di Mucci*, 879 F.2d 1488, 1498 (7th Cir. 1989) (court should consider whether violations have effectively discontinued when deciding whether to grant injunctive relief in a discrimination case).

Nothing in Target's new record keeping policy clearly prevents bad faith destruction of resumes or other employment application documents. Target's new policy involves reiterating its procedures for retaining documents to its store managers and recruiters and outsourcing the physical storage of employment documents. Similar to Target's document retention polices prior to 2001, Target depends greatly on the diligence of the company's recruiters and its managerial personnel to ensure that resumes, applications and interview guides are retained because these personnel must forward the original documents to Brass Ring. Target has not claimed that it has adopted a system of penalties for failure to forward documents or in any other way provided new incentives to ensure compliance with the EEOC's record keeping requirements.

Because these genuine issues of fact bear on whether Target's new record retention policy is sufficient to prevent future violations of federal law, Target's motion for summary judgment on this issue should not have been granted. Consequently, we reverse and remand for further proceedings.

### B. *Title VII Disparate Treatment Claims*

We review the district court's grant of summary judgment on the disparate treatment claims *de novo*, and consider all evidence in the record, and all reasonable inferences from

that record, in the light most favorable to the nonmoving party. *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 805 (7th Cir. 1999). We affirm summary judgment only if the evidence presented does not raise any genuine issue of material fact. Fed.R.Civ.P. 56(c); *Farrell v. Butler University*, 421 F.3d 609, 612 (7th Cir. 2005). The EEOC contends, and we agree, that the district court improperly granted summary judgment in favor of Target on the disparate treatment claims on behalf of James Daniels, Jr., Kalisha White, Ralpheal Edgeston and Cherise Brown-Easley.

The district court properly used the familiar *McDonnell Douglas* burden-shifting test to evaluate the EEOC's claims. *See McDonnell Douglas v. Green*, 411 U.S. 792 (1973). The parties do not dispute that the EEOC established a prima facie case of disparate treatment on behalf of all four claimants at issue in this appeal. On these facts, a prima facie case of disparate treatment is established when the plaintiff shows the following: 1) the applicant belongs to a racial minority; 2) the applicant applied for and was qualified for a job for which the employer was seeking applicants; 3) despite being qualified, the applicant was rejected; and 4) after the applicant's rejection, the position remained open and the employer continued to seek applications from persons of the rejected applicant's qualifications. *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1174 (7th Cir. 2002).

If the plaintiff establishes a prima facie case, the employer must present a legitimate nondiscriminatory reason for its action. *Id.* Then, the plaintiff must have a "full and fair opportunity" to show that the employer's proffered reason was 1. factually baseless; 2. not the employer's actual motivation; 3. insufficient to motivate the action; or 4. otherwise pretextual. *McDonnell Douglas*, 411 U.S. at 804; *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981)*; Vakharia*, 190 F.3d at 807. The EEOC claims that Target did not present a legitimate, nondiscriminatory reason for failing to hire Daniels that was sufficient

to meet Target's burden. The EEOC further claims that its evidence to rebut Target's reason for failing to interview White, Edgeston and Brown-Easley was sufficient to raise a genuine issue of material fact as to whether that reason was a pretext for a discriminatory motive.

### 1. James Daniels, Jr.

Since the parties do not dispute that the EEOC, on behalf of James Daniels, Jr., presented a prima facie case of disparate treatment by Target, the next step is for Target to rebut the inference of discrimination created by this prima facie case. Thus, under the second step of the *McDonnell Douglas* test, Target must clearly expound a legitimate, non-discriminatory reason for its choice not to hire Daniels. *Vakharia*, 190 F.3d at 806-07; *McDonnell Douglas*, 411 U.S. at 802-03. In explaining this reason, the employer need not persuade the court that it did not discriminate against the applicant. *Burdine*, 450 U.S. at 257. Instead the employer must use admissible evidence to raise a genuine issue of fact as to whether it rejected the applicant based on a discriminatory motive. *Id.* at 254-55. The employer must explain its claimed reason for rejecting the applicant clearly enough to allow the court to focus its inquiry on whether the employer honestly believed that reason, *Id.* at 260, and to allow the plaintiff to identify the kind of evidence it must present to demonstrate that the reason is a pretext. *Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004); *see Burdine*, 450 U.S. at 255-56 (stating that the employer must "frame the factual issue with sufficient clarity" so that the plaintiff has an opportunity to "demonstrate pretext").

An employer's reason not to hire an applicant may be subjective, such as an applicant's poor attitude in an interview. *Millbrook*, 280 F.3d at 1176 (employer's reason that the applicant "had poor communication skills

because he failed to make eye contract during the interview and did not seem confident in his answers" was sufficient). In the Eleventh Circuit, an employer must articulate reasonably specific facts that explain how it formed its opinion of the applicant in order to meet its burden under *Burdine*. *Chapman v. AI Transport*, 229 F.3d 1012, 1034-35 (11th Cir. 2000). For example, if the employer rejected an applicant because he gave a "poor interview," the employer must explain what specific characteristic it perceived as "poor," such as that the applicant's interview responses were unclear and off point. *Id.*

The Eleventh Circuit's interpretation of *Burdine* is reasonable because an employer's assertion that it found a plaintiff-applicant "poor" without any further explanation would not create a genuine issue of fact as to whether the employer honestly held that opinion. *See Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 415 (7th Cir. 2005) ("self-serving assertions" do not create a genuine issue of fact). Because the word "criteria" implies that an employer is evaluating specific characteristics of the applicant that are able to be articulated, this interpretation is also consistent with our precedent that allows employers to meet their burden under *McDonnell* using "subjective evaluation criteria." *See, e.g.*, *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1170 (7th Cir. 1998) (stating that "subjective evaluation criteria" such as an employee's lack of "consistency, leadership, initiative, and responsibility skills" were a sufficient basis for an employer's adverse action).

Here, Target did not meet its burden because its explanation was only that "[b]ased upon [his] interview, Target decided that [Daniels] did not meet the requirements for an ETL position, and therefore elected not to hire him as an ETL." (Appellant's App. 27). Without more detail, this explanation does not frame the dispute such that the EEOC can respond to Target's asserted reason with specific evidence that this reason was a pretext for a discriminatory

motive. Indeed, the EEOC has produced evidence that Daniels possessed several qualifications deemed necessary by Target for an ETL position. Daniels was sufficiently qualified for an ETL position to participate in the ELITE interview process. This was the third step toward being hired as an ETL, and included two parts. First, Daniels took a written test to determine leadership ability based on six leadership qualities (Conscientiousness, Drive, Leadership, Resilience, Interpersonal Effectiveness, and Problem Solving). He scored in the ninetieth percentile or above on four of the measured qualities, in the eighty-sixth percentile on one quality and in the fiftieth percentile on the final quality. Second, Daniels participated in three one-on-one interviews. After this process, the interviewers met to discuss Daniels, as they did with all other ELITE partici-pants. The interviewers used their detailed interview forms and written test scores as conversation-starters to discuss whether Daniels should be offered a position. Target produced interview forms with detailed comments about some applicants, but Target did not produce the forms for Daniels.

Because Target did not give a clear statement as to which requirements Daniels lacked, the EEOC's evidence sheds little light on whether Target honestly believed that Daniels was not qualified. Target should have articulated what requirements Daniels failed to meet; Target presented an ostensibly objective nondiscriminatory reason but failed to articulate what criteria informed this reason. Target's proffered reason is insufficient to satisfy its burden to frame an issue of fact so that the court and the EEOC can identify what evidence might rebut that reason. Because Target's reason is insufficient, the EEOC can survive summary judgment without refuting Target's proffered reason. *Patrick*, 394 F.3d at 316 n.20 (quoting *Fisher v. Vassar Coll.,* 114 F.3d 1332, 1335 (2d Cir. 1997), *abrogated on other grounds*); *see St. Mary's Honor Center v. Hicks*, 509 U.S.

502, 510 n.3 (1993) (stating that if an employer fails to show a nondiscriminatory reason at trial the plaintiff will win unless his or her prima facie case does not convince the fact finder to infer a discriminatory motive).

Target argues that whether or not Daniels' case could have survived summary judgment is irrelevant because the EEOC's individual claim on behalf of Daniels is barred because the EEOC did not allege in the district court that Target failed to meet its burden to produce a legitimate reason for rejecting him. However, Target argued (in the context of a class action) that Target did "not cite any evidence" in support of its proffered reason for rejecting Daniels and that this lack of evidence "casts doubt on Target's claim that its hiring process produced legitimate, non-discriminatory reasons for rejecting African-American candidates for ETL jobs." (Appellant's App. 168-69). We find this claim that the EEOC brought in the district court adequate to consider Target's individual claim on behalf of Daniels on appeal.

Target also argues that Daniels' claim is untimely under 42 U.S.C. § 2000e-5(e) because he was rejected more than 300 days before the charge that prompted the EEOC's investigation was filed. *See Equal Employment Opportunity Comm'n v. Harvey L. Walner & Assoc.*, 91 F.3d 963, 968 (7th Cir. 1996) (stating that, after receiving an initial charge, the EEOC may include in its complaint any related unlawful conduct that it discovers in the course of investigating that charge). The district court did not specifically address this issue, but Target encourages us to affirm the district court on this issue. *See J.E. Riley Inv. Co. v. Commr. of Internal Revenue*, 311 U.S. 55, 59 (1940) ("where the decision below is correct it must be affirmed by the appellate court though the lower tribunal gave a wrong reason for its action"); *see also Rauen v. U.S. Tobacco Mfg. LP*, 319 F.3d 891, 895 (7th Cir. 2003) ("[W]e may

affirm a grant of summary judgment on a ground other than that relied upon by the district court below.").

While Target is correct that we may affirm summary judgment on this issue, we decline to do so. Keith Stanley's January 8, 2001, charge was included in the EEOC's complaint along with Kalisha White's May 11, 2001, charge. Although White's charge was the first to allege that Target was discriminating against African-Americans as a class, Stanley's charge brought the possibility of racial discrimination in Target's District 110 to the attention of the EEOC and began the process that led to the instant lawsuit. Target did not argue specifically that Stanley's charge is not the appropriate charge from which to count for the purpose of 42 U.S.C. § 2000e-5(e), though Target assumes that the appropriate charge is that of White. Because the parties did not fully argue this issue on appeal, we leave it to the district court on remand to make this determination after both parties have fully briefed and argued the issue. If the district court determines that Stanley's charge is the appropriate starting point, Daniels charge is not outside the statutory minimum. Daniels was rejected by Target after March 13, 2000, which is within 300 days of when Keith Stanley filed a charge that the EEOC investigated and included in its complaint.

For the reasons discussed above, we reverse the district court's grant of summary judgment in favor of Target on Daniels' individual claim and remand this portion of the case to the district court for further proceedings.

### 2. *White, Edgeston & Brown-Easley*

The district court declined to decide whether White, Edgeston and Brown-Easley presented a prima facie case because it concluded that whether or not a prima facie case was established, the EEOC could not show that Target's nondiscriminatory reason for failing to interview White,

Edgeston and Brown-Easley was pretextual. On appeal, Target did not claim, in response to the EEOC's arguments, that White, Edgeston and Brown-Easley failed to present a prima facie claim; therefore, this issue is not before us.

In the district court, Target argued, and the court agreed, that Target presented a legitimate, nondiscriminatory reason to explain why White, Edgeston and Brown-Easley were not interviewed for ETL positions. Store Team Leader Matthew Armiger's burdensome workload, Target argued, caused him to fail in several of his recruitment duties, including failure to conduct interviews when they were scheduled. The EEOC did not contest this finding; therefore step two of the *McDonnell Douglas* test is satisfied and the burden shifts back to the EEOC.

In step three of the *McDonnell Douglas* test, a plaintiff must show that the defendant's nondiscriminatory reason for rejecting the applicant is a pretext meant to hide a discriminatory motive. *Millbrook*, 280 F.3d at 1175. To satisfy this requirement, a plaintiff must show that (a) the employer's nondiscriminatory reason was dishonest; and (b) the employer's true reason was based on a discriminatory intent. *McDonnell Douglas*, 411 U.S. at 805; *Vakharia*, 190 F.3d at 807. To survive summary judgment, however, the plaintiff need only offer evidence that supports an inference that the employer's nondiscriminatory reason for its action was dishonest. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 726 (7th Cir. 2005); *Weisbrot v. Med. Coll. of Wisconsin,* 79 F.3d 677, 682 (7th Cir. 1996). Therefore, summary judgment is only proper "where no rational fact finder could believe that the employer lied about its proffered reasons for the hiring decision in question." *Rudin*, 420 F.3d at 726 n.8 (internal quotations and citations omitted).

A plaintiff may show pretext indirectly by attacking the employer's credibility. *Burdine*, 450 U.S. at 256. Nonetheless, "general determinations" about an employer's credibil-

ity, though helpful, will not control whether a specific hiring decision was honestly justified. *McDonnell Douglas*, 411 U.S. at 805 n. 19; *see Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978) (stating that the district court could consider the composition of the employer's workforce as evidence that it did not have a discriminatory intent but every applicant was nonetheless entitled to consideration based only on permissible factors).

An applicant can raise a genuine issue of material fact about an employer's credibility by presenting evidence that the employer's explanation was contrary to the facts, insufficient to justify the action or not truly the employer's motivation. *Vakharia*, 190 F.3d at 807; *see Rudin*, 420 F.3d at 726 (stating that evidence that employer's rationale for the action changed over time or that employer did not follow its normal hiring policy created genuine issue of whether employer was credible). A plaintiff cannot raise a genuine issue if the evidence shows only that the employer made a wrong assessment of the applicant. *Millbrook*, 280 F.3d at 1175. Instead, the plaintiff must present evidence that supports an inference that the employer was intentionally dishonest when it gave its nondiscriminatory reason for rejecting the applicant. *Id.* Only evidence of information that was available to the employer at the time it rejected the applicant will be relevant. *Vakharia*, 190 F.3d at 808.

Here, we find that the EEOC did present sufficient evidence to establish a genuine issue of material fact as to whether Target's reason for not interviewing White, Edgeston and Brown-Easley was a pretext for race discrimination. First, Target argued that Armiger could not have discriminated against White, Edgeston and Brown-Easley because he did not know their race. However, the EEOC presented evidence that creates a genuine issue of material fact as to whether Armiger knew the applicants' race. The EEOC showed that each applicant's resume contained information that suggested she might be African-American.

White's resume indicated that she was a member of Alpha Kappa Alpha sorority, and Armiger testified that he knew this to be an African-American sorority. Edgeston's resume showed that she also was a member of Alpha Kappa Alpha sorority, that she majored in African-American studies that she wrote a paper titled *The African-American Response to School Choice in Milwaukee* and that she was a member of the NAACP. Finally, Brown-Easley's resume indicated that she was a member of the "Metropolitan Alliance of Black School Educators." Armiger testified that he typically looked at sorority involvement and extracurricular activities when he reviewed resumes, and that he reviewed White and Edgeston's resumes. In addition, Armiger was in charge of recruiting at University of Wisconsin-Milwaukee, and Edgeston and Brown-Easley's resumes were collected from a multi-cultural career fair at that school.

Additionally, Armiger claims that he failed to interview White because he was "too busy" with his management duties when she called. He claims that he often told applicants that he was too busy to speak to them if they called while he was on the sales floor, and that he did not keep a record of who called. However, fifteen minutes after White called Armiger, Armiger took a call from the fictitious Caucasian applicant, "Sarah Brucker," and scheduled an interview with her. "Brucker" was less qualified than White because White was pursuing an MBA degree but "Brucker" was not, and Armiger recalled seeing in White's resume that she was pursuing this MBA. These facts support a reasonable inference that Armiger's busy schedule was (a) not his actual motivation; or (b) an insufficient reason for failing to interview White, Edgeston and Brown-Easley. Thus, based on this fact as well, a reasonable fact finder could conclude that Target's nondiscriminatory reason for failing to interview the applicants is pretextual.

Target disputes that the Sarah Brucker interview situation aids the EEOC's argument. Target argues that White's

deposition testimony conflicts with her claim that the calls from White and "Brucker" were only fifteen minutes apart because White could not remember at her September 24, 2002, deposition exactly how much time had passed between the calls. Because White affirmed in that deposition that her May 11, 2001, charge of discrimination was correct and because her charge stated that about fifteen minutes passed between the calls, for the purpose of summary judgment we accept the EEOC's assertion that the calls were fifteen minutes apart and find that this evidence can and does aid the EEOC's argument.

Second, Target claims that Armiger would not have had White's resume in front of him when she called to set up an interview and he said he was too busy to do so, and he therefore would not have known her race. However, the EEOC presented expert testimony indicating that some people can determine a speaker's race based on his or her voice or name.

Dr. Thomas Purnell, a linguistics professor, researched racially-affiliated dialects and telephone filtered speech. Purnell had White, Edgeston and Brown-Easley read statements to him over the telephone that were similar to those they made to Armiger. He testified that the three women were discernible as African-American.

Dr. Marianne Bertrand, an economics professor, testified that some corporate recruiters can identify a person's race based on his or her name. Bertrand's study compared job applicants with Caucasian names, such as Sarah, versus applicants with African-American names, such as Lakisha. Bertrand noted that White's first name, Kalisha, is very similar to the name Lakisha that was used in her study. The expert testimony of Purnell and Bertrand might persuade a reasonable fact finder that, at the time of the phone calls, Armiger at least suspected that White was African-American and that "Brucker" was Caucasian.

Target argues that the expert evidence does not raise a genuine issue of fact because it addresses some people's ability to discern race but not Armiger's ability to do so. However, there is a genuine issue of material fact as to whether Armiger was able to distinguish White and Brucker's respective races. *See Rudin v. Land of Lincoln Cmty. Coll.,* 420 F.3d 712, 726 (7th Cir. 2005); *Weisbrot v. Med. Coll. of Wisconsin,* 79 F.3d 677, 682 (7th Cir. 1996).

This expert evidence likewise could lead a fact finder to conclude that Armiger knew Edgeston and Brown-Easley's race because each of these applicants left at least one message for Armiger after he failed to call at their scheduled interview time. Armiger had set up interviews for March 4 and 6, 2001. He was supposed to interview nine ETL candidates over those two days, including Edgeston and Brown-Easley. He failed to interview Edgeston and Brown-Easley as well as two Caucasian candidates. One of the Caucasian candidates does not recall whether he was ever interviewed by Target. Edgeston, Brown-Easley and one of the Caucasian candidates each called Target to find out why they were not interviewed. All three candidates called the same phone number, which was also the number they had called to set up their interviews with Armiger. The Caucasian candidate was interviewed later by another Target official. Edgeston and Brown-Easley were never interviewed.

This evidence, as a whole, raises a genuine issue of fact as to whether Arminger knew White, Edgeston and Brown-Easley's race at the time he failed to interview them. Thus, a reasonable fact finder could conclude that contrary to Target's assertion and Armiger's testimony, Armiger did know the race of the applicants at the time he chose not to interview them.

Finally, Target also argues that if Armiger had intended to discriminate against Edgeston and Brown-Easley he would not have contacted them to set up an interview, and that because Armiger did set up the interview it makes

sense to assume that he would not miss it for a discriminatory reason. The EEOC claims that *Armiger* did not choose to interview Edgeston and Brown-Easley, but instead only followed up on the recommendations of his predecessor and of career fair recruiters. This Court need not address the contours of each side's logic on this point any further than to conclude that there is a dispute over when and with how much care Armiger reviewed Edgeston and Brown-Easley's resumes and who actually decided to interview the individuals. A trier of fact will likely need to resolve this dispute, but at this stage, we construe the facts in the light most favorable to the EEOC, and the EEOC has presented a genuine issue of fact as to whether Armiger was truly the decision-maker that elected to interview Edgeston and Brown-Easley.

Viewing all facts in the light most favorable to the EEOC and drawing all inferences in its favor, we conclude that there is a genuine issue of material fact as to whether Target's proffered reason that Armiger was too busy to interview White, Edgeston and Brown-Easley was a pretext for discriminatory action based on race. Therefore, summary judgment was improper for these applicants' individual claims.

## III. Conclusion

For the foregoing reasons, we REVERSE the district court's grant of Target's motion for summary judgment on its record keeping violations and on the individual disparate treatment claims of James Daniels, Jr., Kalisha White, Ralpheal Edgeston and Cherise Brown-Easley, and REMAND for proceedings consistent with this opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*