In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-2451

RONALD SWEATT,

*Plaintiff-Appellant*,

*v.*

UNION PACIFIC RAILROAD COMPANY,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 9579 — **Sara L. Ellis**, *Judge*.

ARGUED FEBRUARY 20, 2015 — DECIDED AUGUST 6, 2015

Before RIPPLE, KANNE, and TINDER, *Circuit Judges*.

KANNE, *Circuit Judge*. Appellant Ronald Sweatt is an Afri-can-American male who worked for Union Pacific Railroad Company ("Union Pacific"). Union Pacific hired him in 2006 to perform manual labor jobs, and during his time there, he did just that. He served as a Laborer, Assistant Foreman, Trackwalker, Trackman, and Tie Inserter. After a few years on the job, Sweatt manifested pain in his shoulder and hands. The pain progressed to the point that Sweatt could no

longer do his job. So he sought a less strenuous position—
Security Officer—through Union Pacific's Vocational Reha-
bilitation Program. Sweatt did not get the job.

Sweatt subsequently filed suit against Union Pacific. For
his physical injuries, he alleged violations of the Federal
Employers' Liability Act ("FELA"). For the denial of the Se-
curity Officer position, he alleged violations of the Civil
Rights Act of 1991 and the Age Discrimination in Employ-
ment Act ("ADEA"), among other statutes.[1] He bundled
these claims into one action (with five counts) in the North-
ern District of Illinois. Discovery ensued, and Union Pacific
eventually filed a motion for summary judgment on each of
Sweatt's claims. The district court granted Union Pacific's
motion in its entirety. For the reasons below, we affirm.

## I. BACKGROUND

Sweatt's job as a railroad worker was hard work. No one
disputes that. During his time at Union Pacific, he operated
spike mauls, hydraulic tampers, and spiker guns. He swung
sledgehammers, pulled spikes with claw bars, and assisted
with welding. He also inserted—and removed—railroad
ties. Unsurprisingly, this strenuous work caused Sweatt to
develop pain in his shoulder and hands. Sweatt addressed
his shoulder pain in his deposition.

> A. I started having a lot of pain during 2009, the
> year 2009, that year when I was up at Lake Street
> when we started doing a lot of tampering [*sic*].

---

[1] Sweatt also brought claims under the Americans with Disabilities Act,
42 U.S.C. § 12101 *et seq.*, and the Illinois Human Rights Act, 775 ILCS 5/2-
103, but those claims are not before us on appeal.

Q. What time of year was it?

A. What time of year?

Q. Uh-huh—yes.

A. Oh, like in the summer.

Q. Somewhere in June or July or August?

A. It might have been—I know it was—it was warm. It might have been before then.

Q. So it could have been before June?

A. Yeah.

Q. And when you would use the claw bars back probably before June of 2009, you would notice the pain in your shoulder?

A. Yes. Because when I would—when I would use the—use the claw bar, it was just—it was unbearable, you know, I would, you know, try to—I called one of the guys, come over, you know, and give me a hand.

Q. Did you seek medical attention at that time?

A. See I—over the counter I was taking pain medication because I didn't want—I didn't really want no time off work.

During that same timeframe, Sweatt began experiencing pain in his hands. He attributed the cause of the hand pain to repetitive use of hydraulic tools and other hand tools. On November 19, 2009, Sweatt saw a medical professional to address the hand pain. His provider for that healthcare visit, Nurse Practitioner Valentin, entered the following note into Sweatt's medical record: "complaining of bilateral hand pain. The patient has had pain in his hands for quite a while

now. He might have carpal tunnel syndrome. He does repetitive motion at his job."

Eleven days later, on November 30, 2009, Sweatt met with Dr. Coates. According to Dr. Coates, Sweatt first complained of hand pain, which he attributed to his work at Union Pacific, in May of 2009. Sweatt was a Trackman at the time. Upon examination, Dr. Coates believed that Sweatt was unable to perform the job of Trackman.

We pay particular attention to these dates. They are significant because Union Pacific contends that Sweatt's FELA claims[2] are barred by the statute of limitations. To recap:

- May / June 2009–Sweatt notices hand pain. He also describes experiencing "unbearable" shoulder pain. Sweatt requests coworkers to help him use claw bars.

- Nov. 19, 2009–Sweatt sees Nurse Practitioner Valentin for bilateral hand pain.

- Nov. 30, 2009–Sweatt sees Dr. Coates. Dr. Coates says Sweatt is unfit to perform the duties of Trackman.

---

[2] Sweatt alleged nine theories of negligence against Union Pacific under the FELA. According to Sweatt, Union Pacific: (1) neglected to provide him with a reasonably safe place to work; (2) neglected to provide him with safe and proper tools; (3) neglected to provide him with the proper safety equipment; (4) neglected to inspect and maintain its equipment; (5) neglected to warn him about defective tools and equipment; (6) negligently created and permitted a dangerous and hazardous workplace condition; (7) neglected to adopt safe customs and practices; (8) neglected to adopt safe methods and procedures; and (9) committed other acts of negligence. These separate harms resulted, he alleged, in "permanent injuries to his shoulders, arms, hands and wrists and the bones, muscles, tissues, ligaments and internal parts thereof."

▪ Nov. 30, 2012–Sweatt files suit.

Given this series of events, the district court agreed with Union Pacific. It ruled the claims time-barred by the applicable three-year statute of limitations, 45 U.S.C. § 56, and granted summary judgment in favor of Union Pacific.

That brings us to Sweatt's age- and race-based discrimination claims. These claims flow from Sweatt's rejection for the Security Officer position, a position he sought once he could no longer perform his manual-labor jobs. In January 2011, Union Pacific gave Sweatt an opportunity to participate in the Vocational Rehabilitation Program ("VRP"). This program facilitates job placement for railroad workers who are no longer able to perform their existing jobs to due injury or illness. VRP Counselors try to place workers in their previous jobs, in different jobs within Union Pacific, or in positions outside Union Pacific. During their placement efforts, VRP Counselors help workers develop skills in interviewing and résumé drafting.

Sweatt seized the opportunity. When he learned of an open Security Officer position in the greater Chicago area, he expressed interest and applied. Union Pacific scheduled him for an interview in Omaha, Nebraska, where its corporate headquarters are located. Before Sweatt left, VRP Counselor Elizabeth Watson gave him a document that alerted him to areas of interest that could be discussed during the interview. The document, "Information requested on Personal History form for background check," requested information pertaining to arrests, traffic citations, military service, family, education, and references. Watson discussed the form with Sweatt and generally helped him to prepare for the interview.

Sweatt arrived in Omaha on March 16, 2011. Before he began his interviews, he completed a "Personal History Statement." This document was different from the form Watson had given him. Under a heading entitled "ARRESTS," the form asked if he had ever been convicted of a misdemeanor or a felony offense. It also asked if he had ever been on probation or parole, and if he had ever been under indictment or charges for a criminal offense. The form then provided an admonishment: "A conviction may not disqualify you, but a false statement will." Sweatt answered "no" to each of the questions.

Then he met with Candace Girard, Director of Disability Management. She informed him that Union Pacific favors a candidate with integrity and honesty because a Security Officer is charged with guarding multi-million dollar vehicles. After his meeting with Girard, Sweatt met with Bruce Finger, Director of Internal Placement, and Ken Eultgen, Director of Homeland Security. Finger used an "Interview Questioner's Form," the same form he always used when interviewing candidates for the Security Officer position. In accordance with that form, Finger asked Sweatt if he had ever been arrested or convicted of a misdemeanor or felony. Sweatt answered in the negative, and Finger recommended Sweatt for the position.

Then Union Pacific ran a background check. Union Pacific first conducted an "eVerifile" criminal report, which it runs on all prospective employees. That report returned a clean record. The background check did not stop there, however. When someone applies for a position in the police de-

partment,[3] Union Pacific conducts a more thorough investigation. So Special Agent James Weller, Union Pacific (Northern Region), ran a "LEADS/NCIC" criminal check on Sweatt. LEADS/NCIC (Law Enforcement Agencies Data System / National Crime Information Center) is a computerized database that is maintained by the government. It facilitates background checks on all prospective employees in the Northern Region. Here, it indicated that Sweatt had been arrested in the Homewood-Flossmoor area of Illinois. The report disclosed a case number from the Flossmoor Police Department and a State ID number for the arrest. Agent Weller confirmed the arrest.

He then contacted Sweatt's former supervisor, Richard Johnson, who gave Sweatt a positive referral. Johnson stated that Sweatt earned an award for his hard work, never abused sick time, and never gave anyone a hard time. He recommended Sweatt for the job. After receiving a similar, positive referral from Sweatt's former employer of fifteen years, Agent Weller conducted an in-person interview of Sweatt.

During that interview, Agent Weller asked Sweatt if he had ever been arrested. Sweatt again said "no." Agent Weller asked him that question at least three times, and each time Sweatt gave him the same answer—"no." Armed with the background report, Agent Weller decided to confront Sweatt

---

[3] According to Union Pacific's website, the railroad police force dates to the mid-nineteenth century, "when the number of U.S. Marshals was insufficient to police America's growing rail network." *See* https://www.up.com/aboutup/community/safety/special_agents/index.ht m (last visited on July 24, 2015).

with the details of the arrest. He asked Sweatt if he had been arrested in Flossmoor, Illinois. Sweatt finally acknowledged that he had. He quickly called the incident a misunderstanding, noting that the judge tossed the case out of court. He also added that it was a domestic dispute, and that he remained friends with everyone involved.

Agent Weller summarized the results of his background investigation and sent his final report to Jack Harris, Northern Division Captain. Upon review, Harris emailed Finger to memorialize his concerns about the inconsistencies in Sweatt's responses to the arrest questions. Finger, who had previously recommended Sweatt, e-mailed Mark Kalinowski, Regional Director, asking for his opinion on the matter. Kalinowski responded with a negative endorsement on Sweatt's candidacy. In his view, Sweatt did not deserve the Security Officer position due to his untruthfulness related to the prior arrest. Recall Girard's notice: Union Pacific was looking for a person with integrity and honesty.

Finger subsequently notified Sweatt in writing that he was disqualified for the Security Officer position. The form letter, dated March 31, 2011, stated that Sweatt's "background investigation has disclosed information and circumstances that disqualify you as a candidate for Security Officer."

Sweat subsequently filed suit against Union Pacific, alleging, in part, age- and race-based discrimination. In support of his case, Sweatt offers nineteen comparators who have been offered the position of Security Officer since 2009. He argues that these comparators reveal a less-than-level playing field when it comes to competition for the Security Officer position. In his view, the case boils down to questions of

credibility, so his claims should have survived summary judgment.

There is more. Sweatt links the district court's judgment against him to its case management procedure ("CMP") regarding summary judgment. He argues that Judge Sara L. Ellis exceeded her authority by promulgating a CMP that prevents parties from filing separate statements of fact.[4] In Sweatt's view, this rule is inconsistent with Local Rule 56.1 and Federal Rule of Civil Procedure 83. We unfurl this novel argument below.

## II. ANALYSIS

We review a district court's grant of summary judgment *de novo*. *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014). Summary judgment is appropriate where the admissible evidence reveals no genuine issue of any material fact. FED. R. CIV. P. 56(c); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 922 (7th Cir. 2001). A fact is "material" if it is one identified by the law as affecting the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. We "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Apex Digital, Inc. v. Sears, Roebuck, & Co.*, 735 F.3d 962, 965 (7th Cir. 2013). Here, Sweatt is the non-moving party. So we construe all facts and reasonable inferences in his favor.

---

[4] Under the CMP, the parties must file a "joint" statement of undisputed facts.

*A. FELA Claims*

Our discussion begins with Sweatt's FELA claims. The FELA affords redress to injured employees of railroad companies that are engaged in interstate commerce. 45 U.S.C. § 51 *et seq.; see also Conrail v. Gottshall*, 512 U.S. 532, 542 (1994) ("Cognizant of the physical dangers of railroading that resulted in the death or maiming of thousands of workers every year, Congress crafted a federal remedy that shifted part of the human overhead of doing business from employees to their employers.") (internal quotation marks and citations omitted). In crafting this remedy, Congress imposed a three-year statute of limitations. 45 U.S.C. § 56 ("No action shall be maintained under this chapter unless commenced within three years from the day the cause of action accrued.").

In cases like this one, where the statute of limitations is at issue, the date of accrual is key. Accrual is defined in two parts: notice of injury and notice of cause. *See Fries v. Chicago & Nw. Transp. Co.*, 909 F.2d 1092, 1095 (7th Cir. 1990) ("[O]nce a plaintiff is in possession of the critical facts of both injury and governing cause of that injury the action accrues even though he may be unaware that a legal wrong has occurred.") (citation omitted). Actual notice is not required for accrual. *Tolston v. Nat'l R.R. Passenger Corp.*, 102 F.3d 863, 866 (7th Cir. 1996). After a condition manifests itself, the question becomes whether the plaintiff knew or, through the exercise of reasonable diligence, *should have known* of the cause of his injury. *Id.*

Here, Sweatt was on notice of his injuries and the cause of his injuries as early as May or June 2009. Sweatt testified that he first observed his hand and shoulder pain in the summer months of 2009: "I started having [shoulder] pain

during 2009 … like in the summer." When asked if it was "in June or July or August," he answered, "I know it was … warm. It might have been before then." Dr. Coates corroborated that testimony. He testified that Sweatt first noticed his hand pain in May of 2009. And Nurse Practitioner Valentin's notes from Sweatt's November 19, 2009, appointment states that he experienced "pain in his hands for quite a while now." Clearly then, Sweatt's injury manifested itself well before November 30, 2009—the critical three-year mark from his filing in district court. *See Green v. CSX Transp., Inc.*, 414 F.3d 758, 763 (7th Cir. 2005) ("When the specific date of injury cannot be determined because an injury results from continual exposure to a harmful condition over a period of time, a plaintiff's cause of action accrues when the injury manifests itself.").

Sweatt's arguments to the contrary are unavailing. He first argues that "intermittent pain associated with a minor injury" is insufficient to trigger accrual of a claim under the FELA. We do not disagree with that proposition of law, *see Green*, 414 F.3d at 764; we disagree with its applicability to this case. Sweatt's own testimony belies the notion that he experienced "intermittent pain associated with a minor injury." Indeed, he described his shoulder pain as "unbearable," particularly when using the claw bar.[5] He testified that he needed help from his coworkers to use that tool. And by November 30, 2009 (exactly three years before he filed this action), Dr. Coates opined that Sweatt could no longer per-

---

[5] We are unsure why Sweatt questions the district court's reliance on this fact. It is beyond dispute that he testified to enduring "unbearable" pain.

form the work as a Trackman.[6] To be sure, Sweatt testified that he did not miss work as a result of these injuries. But his effort in working in the face of injury does not forestall the date of accrual.

Sweatt next argues that he was unaware that his malady was anything more than muscle soreness. This plea of ignorance is similar to the argument the appellant advanced in *Fries*. In that case, the appellant argued that the statute of limitations for his FELA claim was tolled until a doctor diagnosed him with the relevant injury. 909 F.2d at 1095. We rejected that argument, and held that a plaintiff cannot wait until he receives a medical diagnosis to begin pursuit of his claim. *Id.* We are not alone in this approach. In the cause-of-injury context, the Fifth Circuit also rejects the use of a medical diagnosis as a starting point for the statute of limitations. *See Emmons v. S. Pac. Transp. Co.*, 701 F.2d 1112, 1122 (5th Cir. 1983) ("[W]e think it sufficient for purposes of commencement of the limitations period that the plaintiff knew his complained of condition was work related, and that it is not additionally necessary that he have been formally so advised by a physician.").

Regarding cause of injury, Sweatt immediately linked his pain to his employment with Union Pacific. He testified that he first noticed the pain when he started doing a lot of tamping on the railroad tracks. He called his shoulder pain "unbearable," particularly when he would use the claw bar—a tool specific to his job at Union Pacific. Nurse Practitioner

---

[6] Dr. Coates performed corrective surgery on Sweatt's shoulder in March 2010.

Valentin's November 19, 2009, note corroborates the work-related nature of the injury. She wrote that Sweatt "*does repetitive motion at his job*" (emphasis added). And Dr. Coates also testified that Sweatt associated the pain with his work.

This connection is no leap of logic. After all, Sweatt had performed heavy-duty jobs at Union Pacific for a period of nearly three years. Like a machinist who, after years working in a loud, industrial room, develops hearing loss, *Fries*, 909 F.2d at 1093–94, Sweatt knew or through the exercise of reasonable diligence should have known that his injuries were caused by his work for Union Pacific.

Based on our *de novo* review of the record, Sweatt's FELA claims for the injuries to his shoulder and hands began to accrue well before November 30, 2009. That puts them outside the relevant three-year period, rendering them time-barred by the statute of limitations.

*B. Race and Age Discrimination Claims*

Sweatt's next issue concerns his *prima facie* cases of age and race discrimination. He brings these claims in light of Union Pacific's failure to hire him as a Security Officer.[7] Because Sweatt did not present direct evidence that he was discriminated against, the district court resorted to the burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S.

---

[7] Given the briefing in this case, it is unclear whether Sweatt's race discrimination claim is brought under the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, or the Civil Rights Acts of 1991, 42 U.S.C. § 1981. (Appellant's Br. 36.) Sweatt's complaint alleges a violation under § 1981, so our analysis proceeds under that statute.

792, 802–05 (1973).[8] Under this method, a plaintiff must show that: (1) he is a member of a protected class; (2) he applied for and was qualified for an open position; (3) despite his qualifications, he was rejected for the position; and (4) a similarly situated person outside his protected class was hired for the position instead, or the position remained open. *Gore v. Ind. Univ.*, 416 F.3d 590, 592 (7th Cir. 2005). We note that this familiar burden-shifting framework also applies to age discrimination claims under the ADEA. *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002).

In any event, if a plaintiff can establish this *prima facie* case, then the defendant must present evidence demonstrating a legitimate, nondiscriminatory reason for not hiring the plaintiff for the position. *Norman-Nunnery v. Madison Area Tech. Coll.*, 625 F.3d 422, 432 (7th Cir. 2010). The plaintiff must then present evidence that the stated reason for not hiring was merely pretextual. *Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672, 675 (7th Cir. 2003). Pretext is defined as "a dishonest explanation, a lie rather than an oddity or an error." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002).

Here, Sweatt cannot make out a *prima facie* case for either age- or race-based discrimination. Specifically, he fails to establish the final prong dealing with similarly situated indi-

---

[8] Although the district court laid out the *McDonell Douglas* framework, it proceeded directly to analysis of pretext. *Sweatt v. Union Pac. R.R. Co.*, No. 12 C 9579, 2015 U.S. Dist. LEXIS 76156, at *22-23 (N.D. Ill. June 3, 2014).

viduals.[9] Although similarly situated individuals "need not be identical in every conceivable way," they "must be 'directly comparable' to the plaintiff 'in all material respects[.]'" *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). This record reveals no candidates for the Security Officer position—past or present—who were comparable to Sweatt in all material respects, and yet were treated more favorably than he was (i.e. hired).

We begin our analysis with Sweatt's race discrimination claim under § 1981. Union Pacific offered nineteen people jobs as Security Officers in the past five years. Sweatt uses these individuals as his comparators. Discovery revealed their racial makeup: fifteen were Caucasian, three were Hispanic, and one was African-American. Nine of these individuals hailed from the Northern Region where Sweatt sought his Chicago position. Of those individuals, one was outside Sweatt's protected class and was untruthful on the topic of traffic citations in his paper application. He was hired. But importantly, that candidate immediately rectified the discrepancy in his paper application during his interview. Sweatt, by contrast, did not. During Sweatt's interview, he denied being arrested, and he corrected himself only when confronted by Agent Weller with the specific details of the arrest. That makes Sweatt and this particular comparator qualitatively different.

---

[9] Union Pacific appears to concede that Sweatt was qualified for the position of Security Officer, which satisfies prong 2 of Sweatt's *prima facie* case. Although we doubt that an applicant who is not forthright in an interview is qualified for a position that depends on honesty and integrity, we accept Union Pacific's concession for purposes of our analysis.

The same story plays out when we consider individuals hired by Union Pacific for Security Officer *outside* the Northern Region. Three individuals from this pool also had prior arrests and/or charges brought against them. Unlike Sweatt, however, each of these individuals forthrightly admitted to their prior misdeeds during the interviews. Collectively, then, these comparators are not comparable to Sweatt in all material aspects. It's not the initial lie; it's the cover-up, the persistence in the lie. Sweatt, unlike each of his purported comparators, engaged in the latter activity. The comparators, therefore, are not directly comparable in all material respects, *Coleman*, 667 F.3d at 846, and Sweatt cannot establish his *prima facie* case for race discrimination.

Sweatt's alternative argument, that members outside his protected racial class were treated more favorably than he was because *some* of their summary reports do not state that they had background checks performed, is also unavailing. The fact that a summary report does not contain language indicating that a background check was performed does not mean that it was not performed. It simply means that the check, if one occurred, was not included in the report. And even if this argument somehow satisfied Sweatt's *prima facie* case, which it does not, Sweatt presents no evidence suggesting that Union Pacific's reason for not hiring him—his dishonesty during the interview—is pretextual. *EEOC v. Target Corp.*, 460 F.3d 946, 960 (7th Cir. 2006) ("To satisfy [pretext], a plaintiff must show that (a) the employer's nondiscriminatory reason was dishonest; and (b) the employer's true reason was based on discriminatory intent.").

Our § 1981 analysis applies with equal force to Sweatt's ADEA claim. Sweatt was born on August 6, 1956, so on the

date of his interview, March 16, 2011, he was fifty-four. Under the ADEA, that means he was a member of a protected class, 29 U.S.C. § 631 ("The prohibitions in this chapter shall be limited to individuals who are at least 40 years of age."), which covers prong 1 of his *prima facie* case. Union Pacific does not contest prongs 2 or 3. It does not have to. Because once again, the insurmountable hurdle for Sweatt is prong 4. None of Sweatt's purported comparators made the same fatal mistake that Sweatt made during his interview— persisting in a lie about criminal history. As a result, his comparators are not similar in all material respects, and Sweatt cannot make out his *prima facie* case for age discrimination.

Before we address Sweatt's argument regarding the district court's CMP, we pause to make some final observations on the discrimination claims. We do not doubt Sweatt's explanation that the Flossmoor arrest was a misunderstanding, that the judge tossed the case, and that Sweatt remained friends with all relevant parties. But these facts, which we accept as true, do not change the fact that Sweatt was not forthcoming about the incident during his interview. In the context of an interview for a position where honesty and integrity are paramount (Girard told him so), Sweatt's lack of candor understandably served as the death knell for his candidacy. Sweatt offers no evidence sufficient to create a genuine issue of material fact that the true reason behind the failure to hire was age or race discrimination.

*C. The District Court's Summary Judgment Procedure*

Sweatt argues that the district court's CMP denies a nonmovant the ability to respond to the movant's statement of facts. He further argues that the CMP prohibits a non-

movant from submitting additional facts that he believes would defeat the motion. This, he contends, contravenes Local Rule 56.1. And in this case, he claims, it prejudiced him below. We disagree.

Our analysis begins with the relevant portion of Judge Ellis's CMP:

> Motions for summary judgment and responses must comply with Local Rules 56.1(a)(1)–(2) and 56.1(b)(1)–(2), as well as the procedures outlined herein. Parties are directed to file **a joint statement of undisputed material facts** that the parties agree are not in dispute. The joint statement must include—for each undisputed fact—citations to admissible evidence. The joint statement of undisputed material facts shall be filed separately from the memoranda of law and shall include the line, paragraph, or page number where the supporting material may be found in the record. **The parties may not file—and the court will not consider—separate documents of undisputed facts.** If the nonmoving party refuses to join in the statement, the moving party will nevertheless be permitted to file the motion, accompanied by a separate declaration of counsel explaining why a joint statement was not filed. Failure to stipulate to an undisputed fact without a reasonable basis for doing so may result in sanctions.

Judge Sara L. Ellis, Case Management Procedures, *available at* http://c.ymcdn.com/sites/www.7thcircuitbar.org/resource/res mgr/2014_materials/Ellis.pdf (last visited July 24, 2015) (emphasis in original).

This CMP is concerned solely with a statement of *undisputed material facts* to which *both parties agree*. Nothing in this CMP prohibits *one* party from responding to *another* party's version of the *disputed* facts. And nothing in this CMP prohibits a party from submitting additional facts, as the need may arise. The laudable goal of this CMP is to remove the chaff from the grain in a given case, thereby allowing the parties—and the court—to focus on the facts that are actually in dispute.

Judge Ellis's CMP does not disadvantage a party. If a party refuses to agree to a joint statement, that party can still proceed with its motion for summary judgment. It simply must include a statement explaining why the joint statement was not filed. We note that in this case, the district court allowed Sweatt to amend the joint statement by including five additional facts. That procedure inured to Sweatt's benefit here.

Further, by its own terms, the CMP conforms to the Local Rules of the Northern District of Illinois. The relevant Local Rule, 56.1, directs each party to file "a statement of material facts as to which the moving party *contends* there is no genuine issue … ." N.D. Ill. L.R. 56.1 (emphasis added). That rule aspires to the goal achieved by Judge Ellis's CMP—agreeing that certain material facts are beyond dispute. In practice, however, there is a difference between *contending* that a fact is beyond dispute and *agreeing* that a fact is beyond disputed. Local Rule 56.1(3) focuses on the former. The Committee Comment acknowledges this fact. N.D. Ill. L.R. 56.1 cmt. ("The judges of this Court have observed that parties frequently include in their LR56.1 statements facts that are unnecessary to the motion and/or *are disputed*.") (emphasis

added). Judge Ellis's CMP, on the other hand, encourages the parties to work together to focus on the latter. We find no fault in that. And we certainly find no inconsistency between the CMP and Local Rule 56.1.

Because we find Local Rule 56.1 wholly consistent with Judge Ellis's CMP, we need not discuss Sweatt's remaining argument concerning Federal Rule of Civil Procedure 83. *See* Fed. R. Civ. P. 83 (allowing a judge to "regulate practice in any manner consistent with federal law, rules adopted under 28 U.S.C. §§ 2072 and 2075, and the district court's local rules"). It is without merit.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.